**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Patrick Pasquale TAMMARO and Joseph
Jeff McCranie, Defendants-Appellants.**

**No. 79–2899.**

United States Court of Appeals,
Fifth Circuit.

Feb. 5, 1981.

Kerry J. Nahoom, Fort Lauderdale, Fla., for Tammaro.

Theodore S. Worozbyt, Atlanta, Ga., for McCranie.

William L. McCulley, Dept. of Justice, Atlanta, Ga., for plaintiff-appellee.

Before TUTTLE, VANCE and POLITZ, Circuit Judges.

VANCE, Circuit Judge:

This is an appeal by Patrick Pasquale Tammaro and Joseph Jeff McCranie from the district court's denial of motions to dismiss a conspiracy indictment on double jeopardy grounds.[1] Because we find that appellants' earlier trial involved a different conspiracy than that charged in the indictment under review, we affirm.

In 1979 an indictment was returned against appellants Tammaro and McCranie, and other defendants Buford Breland, Roy Efrom Lance, Robert Daniel Williams, Michael Paul Gulemmo and Joseph Taglianetti, by a federal grand jury in Atlanta, Georgia. Count I of the ten count indictment charged defendants Tammaro, McCranie, Breland, Lance, Gulemmo and Taglianetti with knowingly conspiring to "barter, sell and dispose" and "receive, conceal and store stolen goods" transported in interstate commerce in violation of 18 U.S.C. §§ 2 and 2315. Paragraph 6 of Count I of the indictment charged that the alleged conspiracy existed between January 8, 1975 and January 30 or 31, 1975.

Count II charged defendants Tammaro, McCranie, Breland, Lance and Williams with conspiring to violate a number of statutes relating to the possession and sale of firearms. The specific allegations included: conspiring to provide firearms to one convicted of a crime (18 U.S.C. §§ 2 and 922(h)(1)); conspiring "to transfer, sell, trade, give, transport and deliver firearms" in interstate commerce (18 U.S.C. §§ 2 and 922(a)(5)); conspiring "to barter, sell and dispose of stolen firearms" in interstate commerce (18 U.S.C. §§ 2 and 922(j)); conspiring to transport and ship stolen firearms (18 U.S.C. §§ 2 and 922(i)); and conspiring to receive, transport and sell stolen firearms valued in excess of $5,000 in interstate commerce (18 U.S.C. §§ 2 and 2315). Paragraph 9 of Count II charged the defendants with conspiring from "on or about January 30, 1975" until February 5, 1975. The remaining counts of the indictment charged various defendants with substantive violations in connection with the firearms.

On July 5, 1979 the United States Magistrate filed his report and recommendations as to various motions filed by the defendants. The magistrate recommended that because Gulemmo was named only in the first count of the indictment, Count I should be severed from Counts II through X. In a subsequent hearing in United States District Court, Tammaro objected to severance of the counts rather than the defendants. The district judge, however, ruled that defendants Tammaro, McCranie, Breland and Gulemmo would be tried before a jury on Count I. Before trial, McCranie moved to dismiss the indictment on the grounds of double jeopardy and collateral estoppel; in the alternative McCranie sought a ruling that the government be foreclosed from relitigating issues of fact resolved in McCranie's favor at an earlier trial in 1977 for conspiracy to distribute controlled substances. McCranie's motion was denied.

---

1. Although McCranie raises a double jeopardy issue on appeal, his principal argument is that the government should be foreclosed from litigating certain factual issues which he claims were resolved in his favor at a 1977 trial. Because this circuit in *United States v. Mock*, 604 F.2d 336 (5th Cir. 1979) ruled that it was without jurisdiction under 28 U.S.C. § 1291 (1976) to review the trial court's denial of appellant's motion to suppress evidence on the basis of collateral estoppel, McCranie's appeal is not properly before this court and will not be considered at this time. *Accord, United States v. Lee*, 622 F.2d 787 (5th Cir. 1980). To the extent that McCranie's motion to dismiss rests on double jeopardy grounds alone, it is subject to the same ruling as Tammaro's motion to dismiss.

The case came to trial on Count I. After the presentation of the government's case the defendants moved for a directed verdict. The court granted the motion and entered the judgment of acquittal, ruling that the government had failed to prove that the stolen goods had moved in interstate commerce. Subsequently, Tammaro moved to dismiss Counts II, VI, VII, IX and X of the indictment, contending that he had been charged with participation in only one conspiracy and that he could not be placed in jeopardy two times for the same conspiracy. The district court denied the motion, concluding that the indictment properly alleged two separate conspiracies.

On appeal, Tammaro argues that the district court erred in denying his motion to dismiss because the record reflects that the charges set forth in the multi-count indictment encompass but one conspiracy; further prosecution after acquittal on Count I would therefore violate the fifth amendment guarantee against double jeopardy. In essence, Tammaro claims that the indictment charges him with conspiring to deal in a variety of stolen goods and that the different counts pertain to different aspects of the same central conspiracy. The government, on the other hand, maintains that Count I alleges a conspiracy to deal in stolen jewelry whereas Count II charges a separate agreement to deal in stolen firearms. To determine the merit of these positions, it is necessary to consider in some detail the proof offered in the trial on Count I.

At the trial, unindicted coconspirators John Piazza and Charles Keck testified as to McCranie's and Tammaro's involvement with stolen jewelry. Keck and Piazza became associated in the marijuana business in early 1973. During the next three years they expanded their operations until they were doing business over the entire eastern seaboard and were also dealing in cocaine. In addition to illegal drug trafficking, Keck and Piazza were involved in buying stolen jewelry and guns. Keck and Piazza and other defendants were arrested in April 1977 in connection with their drug activities. Keck entered into a plea agreement which included cooperation with the government. Piazza pled guilty and later decided to cooperate with the government.

According to Keck, in late December 1974 he told defendant McCranie and coconspirator Breland that he and Piazza were interested in "buying anything in large quantities that we could turn around, anything that was hot, nothing legitimate," and also told them that Piazza was "a great one for loving jewelry." Subsequently, Keck arranged a meeting with Piazza to make a deal with the people who had some stolen jewelry. On January 30, 1975 Piazza and Tammaro flew from Miami, Florida to Atlanta. Prior to the trip Piazza talked to Tammaro and Taglianetti in New York about obtaining a jeweler to look at the jewelry. Keck met Tammaro and Piazza at the airport and then went to a hotel where two rooms had been reserved in Piazza's name. There they met with Gulemmo, Taglianetti and an unidentified person, referred to as the jeweler, to discuss the stolen jewelry. McCranie and Breland joined the group. Breland informed them that they would have to take a ride to see the jewelry.

The group drove to a country store in Cumming, Georgia where they met with coconspirators W. T. (W. T. Ridings) and Jeep (Roy Efrom Lance). According to Keck, Breland introduced Ridings and Lance to the others, and Lance then "flashed" a couple of rings. The group stood in front of the general store, looking at the jewelry by the light from the gas pumps. Lance told the group that he had about three hundred to four hundred thousand dollars worth of stolen jewelry to sell but that he could not show it to them until the person who had it returned to town. Following the meeting in Cumming, Taglianetti, Gulemmo and the unidentified jeweler returned to New York. Keck testified "they just wanted to get out of there, you know, because it didn't look like it was going to happen right away." According to Piazza, they said they would return when the jewelry became available.

THE prosecutor next explained to the court that he was about to proffer matters that had not been ruled on. The judge excused the jury and allowed the prosecutor to continue to question Keck. Keck testified that Lance proposed as an interim measure that the group buy some stolen guns to show their "good faith so he knew there was going to be no problems." The proposal was agreed to, and then Piazza, McCranie, Gulemmo, Taglianetti and the jeweler left to go back to Atlanta. Tammaro, Keck and Breland followed Ridings and Lance in Breland's automobile to a shack outside of town, where Keck and Tammaro looked at the guns and agreed upon a price. The next day Piazza, Keck and Tammaro met W. T. and Jeep at McCranie's trailer in Jonesboro, Georgia to obtain the stolen guns. Eventually, the guns were taken to Florida by a friend of Keck's from Atlanta. After delivery of the guns to McCranie's trailer, Piazza and Tammaro returned to Miami. The trial judge disallowed the proffered testimony concerning the firearms and the jury was not allowed to hear it.

The government's consistent position has been that the stolen jewelry conspiracy ended when Taglianetti, Gulemmo and the unidentified jeweler left the meeting at the store and returned to New York and that the second conspiracy concerning stolen firearms began immediately thereafter. Tammaro argues that the government has created an artificial distinction between the different stolen goods involved in the conspiracy based on the nature of the goods.

█ Initially, we note that the district court's denial of Tammaro's motion to dismiss an indictment on double jeopardy grounds is an appealable order. *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977); *United States v. Stricklin*, 591 F.2d 1112, 1117 (5th Cir.), *cert. denied*, 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979). Once the appellants demonstrated that their double jeopardy claim was not frivolous, the burden of proof was on the government. 591 F.2d at 1124.

The double jeopardy clause of the fifth amendment is a guarantee "that the State with all its resources and power shall not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity . . . ." *Green v. United States*, 355 U.S. 184, 187, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957). "This guarantee is expressed as a prohibition against multiple prosecutions for the 'same offense.'" *Ashe v. Swenson*, 397 U.S. 436, 450, 90 S.Ct. 1189, 1197, 25 L.Ed.2d 469 (1970) (Brennan, J., concurring). Traditionally, the test of a double jeopardy claim "for determining the identity or separateness of offenses charged in two indictments is whether or not the same proof will sustain a conviction under both, or whether one requires proof of facts not required by the other." *Bacom v. Sullivan*, 200 F.2d 70, 71 (5th Cir. 1952), *cert. denied*, 345 U.S. 910, 73 S.Ct. 651, 97 L.Ed. 1345 (1953). *Accord, United States v. Carlton*, 475 F.2d 104, 107 (5th Cir.), *cert. denied*, 414 U.S. 842, 94 S.Ct. 100, 38 L.Ed.2d 80 (1973). This circuit, however, in *United States v. Marable*, 578 F.2d 151, 153 (5th Cir. 1979) noted that a more detailed examination of the record is required when a claim is made that two conspiracies are in reality one, than "with respect to other offenses under the 'same evidence' test, *cf. United States v. Ruigomez*, 576 F.2d 1149 (5th Cir. 1978) . . . ." As other opinions have recognized, the teaching of *Marable* is that "the essence of a double jeopardy determination in a conspiracy case is whether there was more than one agreement." *United States v. Stricklin*, 591 F.2d 1112, 1125 (5th Cir. 1979) (citing *Marable*, 578 F.2d at 153). In examining the record to determine whether more than one conspiracy existed in *Marable* the court focused on the following elements: (1) time, (2) persons acting as coconspirators, (3) the statutory offenses charged in the indictments, (4) the overt acts charged by the government or any other description of the offense charged which indicates the nature and scope of the activity which the government

THE prosecutor next explained to the

sought to punish in each case, and (5) places where the events alleged as part of the conspiracy took place. 578 F.2d at 154 (citing *Arnold v. United States*, 336 F.2d 347 (9th Cir. 1964), *cert. denied*, 380 U.S. 982, 85 S.Ct. 1348, 14 L.Ed.2d 275 (1965); *Short v. United States*, 91 F.2d 614 (4th Cir. 1937)).

■ In denying Tammaro's motion to dismiss, the district court relied on *Marable* to find that the indictment properly alleged two separate conspiracies. Our consideration of the following factors suggested in *Marable* leads us to agree that there were two separate agreements, one to deal in firearms, the other related to the stolen jewelry:

(1) *Time*: The time periods alleged in the jewelry conspiracy are close to those alleged in the firearms conspiracy. It is clear, however, that all significant acts in the firearms conspiracy (Count II) took place after the jewelry conspiracy (Count I) was put in abeyance.

(2) *Persons*: Four defendants are named in both counts of the indictment. Two defendants are named in Count I but not in Count II. One defendant is named in Count II but not in Count I.

(3) *Statutory offenses*: Both conspiracies are charged under 18 U.S.C. § 371, but the substantive violations alleged are quite different. In the jewelry conspiracy, it is charged that the conspirators agreed to do acts in violation of 18 U.S.C. § 2315. Count II refers to agreements to do acts in violation of 18 U.S.C. § 922(h)(1), 922(a)(5), 922(j) and 922(i) in relation to possessing, transporting, concealing, receiving and selling stolen firearms. Additionally, Count II alleges the agreement included violations of 18 U.S.C. §§ 2314, 2315.

(4) *Overt acts*: Once discussions began concerning the firearms at the country store in Cumming, Georgia all acts thereafter were related only to the firearms conspiracy.

(5) *Places*: Although there is an identity of places as to important events of each conspiracy, there are also differences of locations.

The government recognized at oral argument that the time periods and places of the two conspiracies very nearly overlap. We do not read *Marable* to require the government to show that each of the factors demonstrates the existence of more than one conspiracy. Rather, the elements suggested in *Marable* are for the guidance of the court in determining whether more than one conspiracy existed. As stated earlier, "the essence of a double jeopardy determination in a conspiracy case is whether there was more than one agreement." *Stricklin*, 591 F.2d at 1125 (citing *Marable*). From our review of the record we conclude that the district court correctly found that there were two separate agreements; thus, the acquittal on Count I does not place the defendants in double jeopardy. We also note that the traditional "same evidence" test, recognized in *Stricklin*, as still "valuable" in a double jeopardy determination, dictates a similar result because the trial court excluded evidence relating to the stolen firearms conspiracy at the trial on Count I.

AFFIRMED.