**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Charles Eldon LOKEY, Michael Stutevoss, Christopher Anthony Davis, Defendants–Appellants.**

No. 90–8245.

United States Court of Appeals, Fifth Circuit.

Oct. 10, 1991.

Rehearing and Rehearing En Banc Denied Nov. 14, 1991.

---

Dick DeGuerin, Houston, Tex., for Lokey.

James H. Feldman, Jr., Peter Goldberger, Philadelphia, Pa., for Stutevoss.

George Scharmen, San Antonio, Tex., for Davis.

Michael F. Tubach, Dept. of Justice, Washington, D.C., LeRoy Morgan Jahn, Asst. U.S. Atty., San Antonio, Tex., for U.S.

Before REYNALDO G. GARZA, WIENER and BARKSDALE, Circuit Judges.

BARKSDALE, Circuit Judge:

Charles Eldon Lokey, Michael Stutevoss, and Christopher Anthony Davis were convicted of conspiracy to distribute a controlled substance and possession of a controlled substance with intent to distribute. The numerous issues raised on appeal turn, for the most part, on whether a single conspiracy was proved. Lokey and Stutevoss also challenge their sentences. We AFFIRM.

I.

In 1988, federal and state agents identified a network of wholesale marijuana dealers centered around Richard Coulter in Austin, Texas. Coulter and approximately thirty others connected with the operation, including appellants, were arrested in May 1989. Coulter, who pleaded guilty, was the main government witness at the trial of Lokey, Stutevoss, and Davis.

Coulter first met Lokey in 1979, when Coulter sold him ten pounds of hashish through an intermediary. Coulter and Lokey established a business relationship which enabled them to "advance" each other marijuana. Through this practice, marijuana would be provided at no cost, with the seller being paid when the buyer found another buyer. For each of these transactions, Lokey or Coulter would earn a commission for each pound of marijuana he successfully brokered. This relationship continued until Lokey moved to Garland, Texas, in 1985 to open a business. Even while Lokey was involved in his new business, he maintained his contacts with Coulter. For example, Coulter testified that Lokey called and offered to sell him a rather large load of Mexican marijuana during this period.

In February 1987, Shawn Siegel, another Austin marijuana dealer with whom Coulter had dealt, was arrested for possession of marijuana. Siegel agreed to sell his marijuana distribution network to Coulter. He gave his list of sources and customers to Coulter in exchange for 50 percent of the profits on every deal Coulter made with Siegel's connections for one year. Appellant Stutevoss and Robert Erkkila were two of Siegel's customers who began dealing with Coulter under this agreement.

Pursuant to this arrangement, in March 1987, Siegel introduced Coulter to Robert Erkkila, of Nashville, Tennessee. Erkkila, who also testified at trial, agreed to deal with Coulter instead of Siegel and became Coulter's regular customer. Erkkila bought approximately 60 pounds of marijuana from Coulter in a transaction in September 1987, over 90 pounds that October, and 40 pounds that December.

In December 1987, Erkkila was arrested when he attempted to ship 67 pounds of marijuana he had purchased from Coulter. While Erkkila was on bail, he decided to hire Christopher Davis, his largest custom-

er, to drive to Austin to pick up the loads of marijuana from Coulter. Erkkila and Coulter would work out the details, such as price and quantity, in a coded telephone call, then Erkkila would give Davis the money in a suitcase, Davis would provide the transportation for a $500 fee, Erkkila would pay Davis' expenses, and Davis would bring the marijuana back to Nashville. Erkkila sent Davis to Austin a couple of times a month between April and October in 1988. Erkkila estimated that Davis transported a total of approximately 300 pounds of marijuana for him. Although Erkkila fired Davis in November 1988 for being undependable, Davis was rehired in February 1989; and he continued to transport drugs for Erkkila until they were both arrested in May 1989.

As noted, Stutevoss was another of Siegel's customers who agreed to switch to Coulter as the source for his marijuana when Siegel was arrested in February 1987. Stutevoss arranged the terms of each deal in a coded telephone call with Coulter. He would usually go to Coulter's house late at night and buy five to six pounds of marijuana. Coulter estimated that as a result of the arrangement with Siegel, he sold a total of 150 to 180 pounds of marijuana to Stutevoss between February 1987 and May 1989. Additionally, Stutevoss bought three to four pounds of "Mexican Sativa" marijuana from Coulter in December 1988 and 20 pounds of "lime green" marijuana in February 1989. On the other hand, Coulter bought small amounts of "extraordinary grade" marijuana from Stutevoss.

In March 1988, Charles Lokey sold his business in Garland and moved back to Austin and in with Coulter. Coulter testified that between March and November in 1988, Lokey helped him sell approximately 160 pounds of marijuana. While Lokey was staying with Coulter, he helped him sell two substantial loads. Lokey sold, and received commission for, 65 pounds of a 105–pound load (Stutevoss bought 12 pounds of this load from Coulter); and Lokey helped Coulter sell 56 pounds of a 60–pound load of "Mexican–Afghani" mari-

juana, keeping the other four pounds as a commission on the sale.

In August 1988, Coulter purchased 150 pounds of "black bags" marijuana and sold 100 pounds of it to another marijuana dealer. Davis purchased 16 pounds of this marijuana for Erkkila, and Lokey sold 20 pounds to his customers. In November 1988, Coulter sold 12 to 14 pounds of marijuana to Lokey's customers; Lokey received a commission on this sale. After Lokey moved into his own apartment in December 1988, he continued to sell marijuana for Coulter.

In late March, 1989, pursuant to court authorization, the government installed electronic surveillance devices in Coulter's house and garage, and on his telephone. (Numerous tapes of these intercepted communications were played for the jury.) In early May, 1989, the government closed down the investigation, arrested Coulter, and seized marijuana and ledgers from his home. As noted, approximately thirty individuals were arrested, including Lokey, Stutevoss, and Davis.

Lokey, Stutevoss, and Davis were indicted, along with eight others, on two counts: conspiracy to distribute a controlled substance, in violation of 21 U.S.C. §§ 846 and 841(a)(1) (count 1); and possession of a controlled substance with intent to distribute, in violation of § 841(a)(1) (count 2). Among others, and as noted, Coulter and Erkkila testified at trial, as did Jeff Mihalik, who also purchased marijuana from Coulter and Lokey. Lokey testified; Stutevoss and Davis did not. They were found guilty by a jury. Lokey was sentenced to 78 months imprisonment on the first count and 60 months on the second, to run concurrently, five years supervised release on each count, to run concurrently, a fine of $7,500, and a special assessment of $100. Stutevoss was sentenced to 63 months imprisonment on the first count and 60 on the second, to run concurrently, five years supervised release on each count, to run concurrently, a fine of $5,000, and a special assessment of $100. And Davis was sentenced to 84 months on the first count and 60 months on the second, to run concur-

rently, five years supervised release on each count, to run concurrently, a fine of $20,000, and a special assessment of $100.

## II.

There is no dispute that the appellants were involved with sizeable amounts of marijuana. Instead, they raise other issues concerning conspiracy and possession with intent to distribute. They contend that (1) the district court improperly admitted evidence that the conspiracy began before February 1987; (2) the prosecutor's reference during closing argument to Coulter's notes was improper; and (3) the jury was not properly instructed on appellants' theory of the case. In addition, Lokey and Stutevoss contend that (1) there was insufficient evidence that they were members of the conspiracy or that they even committed the substantive offense (possession with intent to distribute); and (2) they were "minor participants" in the conspiracy, and should have received a downward adjustment at sentencing. Finally, Lokey contends that, in determining his sentence, the district court improperly considered marijuana he possessed outside the time period listed in the indictment.

## A.

Appellants contend that the district court erred in admitting evidence of events which occurred before the time frame stated in the indictment. Lokey and Stutevoss maintain that this constituted a constructive amendment of the indictment and that there was a material variance between the proof and the indictment; all three assert that it was improper under Fed.Rule Evid. 404(b).

The first count of the indictment stated in part:

That beginning on or about February, 1987, and continuing until on or about May 3, 1989, ... Defendants ... and other persons ... unlawfully, willfully, and knowingly did combine, conspire, confederate and agree together and with

each other to distribute more than 100 kilograms of marihuana....

The second count stated in part:

That from on or about February, 1987, until on or about May 3, 1989, ... Defendants ... did unlawfully, knowingly, and intentionally possess with intent to distribute more than 100 kilograms of marihuana....

1.

■ "A conspiracy is an agreement between two or more people to commit a crime." *United States v. Manotas–Mejia,* 824 F.2d 360, 364 (5th Cir.), *cert. denied,* 484 U.S. 957, 108 S.Ct. 354, 98 L.Ed.2d 379 (1987). A conspiracy conviction must be upheld if any rational jury could find beyond a reasonable doubt that " 'a conspiracy existed, that each co-defendant knew of the conspiracy, and that each co-defendant voluntarily joined in it.' " *United States v. Simmons,* 918 F.2d 476, 483–84 (5th Cir. 1990) (quoting *United States v. Molinar–Apodaca,* 889 F.2d 1417, 1423 (5th Cir. 1989)). Lokey and Stutevoss contend that there was a constructive amendment of the conspiracy charged in the indictment (count 1); that accordingly, their Fifth Amendment rights were violated. They assert that the district court erred both in permitting the government to maintain and prove that the conspiracy began in 1982, as opposed to February of 1987, the date alleged in the indictment, and in not instructing the jury that it had to find that appellants conspired with each other.

■ The Fifth Amendment provides in part that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend. V. This right is violated if evidence introduced at trial and the charge "permit[ ] [the jury] to convict the defendant upon a 'set of facts distinctly different from that set forth in the indictment.' " *United States v. Chandler,* 858 F.2d 254, 257 (5th Cir.1988) (quoting *United States v. Young,* 730 F.2d 221, 223 (5th Cir.1984)). " '[A] constructive amendment of the indictment occurs when the jury is permitted

to convict the defendant upon a factual basis that effectively modifies an *essential element* of the crime charged.' " *Id.* at 257 (emphasis added) (quoting *Young,* 730 F.2d at 223).

■ Lokey and Stutevoss maintain that the indictment charges a single conspiracy, not the multiple conspiracies for which they contend they were convicted. Whether the evidence proved one or more conspiracies, turns on (1) whether there was a common goal, (2) the nature of the scheme, and (3) the overlap among the participants in the various dealings. *United States v. DeVarona,* 872 F.2d 114, 118 (5th Cir.1989). Needless to say, the jury may draw reasonable inferences from the evidence presented at trial. *E.g., Richter, S.A. v. Bank of America Nat'l Trust & Savs. Ass'n,* 939 F.2d 1176, 1187 (5th Cir.1991). The jury was presented with evidence from which it could reasonably infer that the appellants were involved in a single conspiracy to distribute marijuana. Coulter testified that (1) he and Lokey were involved in a significant number of marijuana transactions together; (2) he had purchased a distribution network, which included the names of Erkkila and Stutevoss, from Siegel; (3) Davis purchased more than 250 pounds of marijuana from him for delivery to Erkkila; (4) Stutevoss purchased between 150 and 180 pounds of marijuana from him; and (5) Lokey helped him sell approximately 160 pounds of marijuana. Tape transcripts were played to the jury which showed that appellants used coded language when making marijuana deals over the phone. The jury heard the testimony of Mihalik and Erkkila and reviewed notes that Coulter made following his arrest, detailing some of his drug transactions.

Furthermore, the jury could reasonably have concluded that appellants had a common goal of distributing marijuana for profit, that they knew they were part of a larger network of distributors, and that the activities of each appellant were necessary or advantageous to the success of the overall venture.

Where the activities of one aspect of the scheme are necessary or advanta-geous to the success of another aspect of the scheme or to the overall success of the venture, where there are several parts inherent in a larger common plan, or where the character of the property involved or the nature of the activity is such that knowledge on the part of one member concerning the existence and function of other members of the same scheme is necessarily implied due to the overlapping nature of the various roles of the participants, the existence of a single conspiracy will be inferred.

*United States v. Elam,* 678 F.2d 1234, 1246 (5th Cir.1982) (citations omitted). In short, it was reasonable for the jury to infer that Lokey, Stutevoss, Davis, and Coulter, among others, participated in a common scheme to distribute Coulter's marijuana for profit. "[I]n many narcotics distribution networks the ultimate retailers may not know the identities of those who supply their wholesaler, and the retailers' identities may be unknown to those suppliers; but all are well aware that they are participating in a collective venture." *United States v. Martino,* 664 F.2d 860, 876 (2d Cir.1981), *cert. denied,* 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982). "Conspiracies to distribute narcotics have generally been considered to be prime examples of chain, or interconnected, conspiracies, in which a participant in a segment of the conspiracy may be convicted of participation in the whole." *United States v. Michelena–Orovio,* 719 F.2d 738 (5th Cir. 1983) (en banc) (footnotes omitted), *cert. denied,* 465 U.S. 1104, 104 S.Ct. 1605, 80 L.Ed.2d 135 (1984).

■ At issue is whether the appellants were convicted of multiple conspiracies, instead of the single conspiracy charged. We do not find that this is the case. The jury was so instructed:

You must determine whether the conspiracy charged in the Indictment existed and, if it did, whether the Defendant was a member of it. If you find that the conspiracy charged did not exist, then you must return a not guilty verdict, even though you find that some other conspiracy existed. If you find that a

Defendant was not a member of the conspiracy charged in the Indictment, then you must find that Defendant not guilty, even though that Defendant may have been a member of some other conspiracy.

This instruction does not permit the jury to convict for an offense not charged in the indictment.

■ Likewise, proof of the conspiracy's existence before February 1987 was not a constructive amendment of the indictment. "[A]n allegation as to the time of the offense is not an essential element of the offense charged in the indictment and, 'within reasonable limits, proof of any date before the return of the indictment and within the statute of limitations is sufficient.'" *United States v. Cochran*, 697 F.2d 600, 604 (5th Cir.1983) (quoting *Russell v. United States*, 429 F.2d 237, 238 (5th Cir.1970)) (emphasis added). The indictment did not state the date on which the conspiracy began. Instead, it provided the dates during which a conspiracy existed in which the appellants participated. When conspiracy is charged, an "indictment satisfies the requirements of the statute of limitations if the government alleges and proves, at trial or pretrial, that the conspiracy continued into the limitations period." *United States v. Butler*, 792 F.2d 1528, 1532 (11th Cir.), *cert. denied*, 479 U.S. 933, 107 S.Ct. 407, 93 L.Ed.2d 359 (1986).

■ And, the contention that the jury should have been instructed that it had to find that defendants conspired with each other to distribute marijuana is also without merit. The indictment charged that defendants did "combine, conspire, confederate and agree together and with each other." The jury was instructed to convict only if it found that the defendants "join[ed] together to attempt to accomplish some unlawful purpose." Because appellants failed to object at trial to this instruction, we review it only for plain error. Use in the instruction of "joined together" rather than of "with each other" did not constitute a constructive amendment of the indictment; in any event, it falls far short of being plain error.

### 2.

■ Lokey and Stutevoss also contend that there was "a material variance between the single conspiracy alleged and the multiple conspiracies proved." As noted, a constructive amendment occurs when a jury is permitted to convict upon a factual basis that effectively modifies an essential element of the crime charged. *Chandler*, 858 F.2d at 257. On the other hand, a material variance may occur when "'the variation between proof and indictment does not effectively modify an essential element of the offense charged.'" *United States v. Baytank (Houston), Inc.*, 934 F.2d 599, 606 (5th Cir.1991) (quoting *Young*, 730 F.2d at 223). A constructive amendment is reversible per se; a material variance is evaluated under the harmless error doctrine.[1] *Id.*

"With variance, our concern is whether the indictment, assuming it has otherwise alleged the elements of the offense, has so informed a defendant that he can prepare his defense without surprise and has protected him against a second prosecution for the same offenses." *Cochran*, 697 F.2d at 604 (citing *United States v. Hall*, 632 F.2d 500, 504 (5th Cir.1980)). "A defendant must be given notice of the charge he is to defend. Adequacy of notice is not measured in technical pleading terms but by a pragmatic inquiry by the trial judge into whether on the facts of the case at issue

---

1. The term "material variance" may be misleading. For example, it is logical to conclude that if substantial rights have not been affected, the variance is not material. This does not, however, appear to be consistent with the use of the term "material variance". *See United States v. Manzella*, 782 F.2d 533, 539 (5th Cir.) (once defendants prove material variance, they are entitled to a new trial if they show that their substantial rights were affected by the variance), *cert. denied*, 476 U.S. 1123, 106 S.Ct. 1991, 90 L.Ed.2d 672 (1986); *United States v. Sutherland*, 656 F.2d 1181, 1189 (5th Cir.1981) (a material variance is reversible error only if defendant's substantial rights are affected), *cert. denied*, 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982).

the defendants knew what they were defending." [2] *Id.*

Lokey and Stutevoss contend that the variance occurred when the district court allowed the government to prove a conspiracy that began before 1987; and, again, that the government proved multiple conspiracies, as opposed to a single conspiracy. Although the indictment specifies a time frame within which the government had to prove defendants were conspiring (February 1987 through May 1989), it did not charge that the conspiracy came into existence only as of February 1987. *See Id.* (government allowed to offer proof of conspiracy's birth outside the time frame of the indictment).

■ "In analyzing whether the nature of the scheme points to a single conspiracy, this court has avoided analogies to wheels, rims, hubs and chains." *DeVarona* 872 F.2d at 118 (citing *United States v. Richerson*, 833 F.2d 1147, 1153 (5th Cir.1987)). This circuit, in distinguishing between a single conspiracy and multiple conspiracies, has focused on the following elements: "(1) the time period involved; (2) the persons acting as co-conspirators; (3) the statutory offenses charged in the indictment; (4) the nature and scope of the criminal activity; and (5) the places where the events alleged as the conspiracy took place." *United States v. Devine*, 934 F.2d 1325, 1333 (5th Cir.1991) (citing *United States v. Tammaro*, 636 F.2d 100, 103 (5th Cir.1981)). The evidence at trial did not prove a conspiracy different from that charged in the indictment.

Lokey and Stutevoss maintain that *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), requires a reversal when multiple conspiracies are shown at trial, but a single conspiracy is charged. In *Kotteakos*, one central figure helped eight others secure fraudulent loans; and the Supreme Court held that joint participation with one central figure,

without more, was not enough to show a single conspiracy. *Id.* at 773, 66 S.Ct. at 1252. *Kotteakos* is not dispositive here. As discussed *infra*, the defendants stood to gain from each other's involvement. Coulter testified that he accomplished his marijuana business through a "number of associates."

■ Furthermore, even assuming appellants did not know each other, there is sufficient overlap of personnel if a pivotal figure, such as Coulter, directs and organizes the illegal activity, and has extensive dealings with each of the parties. *DeVarona*, 872 F.2d at 119–20. "Parties who knowingly participate with core conspirators to achieve a common goal may be members of an overall conspiracy." *Richerson*, 833 F.2d at 1154 (quoting *United States v. Perez*, 489 F.2d 51, 62 (5th Cir. 1973), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974)). As noted, it was reasonable for the jury to infer that Lokey, Stutevoss, and Davis knew, in dealing with Coulter, that they were part of a conspiracy. The jury could have reasonably inferred from the fact that Coulter purchased large amounts of marijuana which he sold in smaller quantities for distribution on a regular basis to Lokey, Stutevoss, and Davis: that Coulter was a wholesaler; that Lokey, Stutevoss, and Davis were retailers; and that each retailer relied on the others to help distribute the wholesale quantities of marijuana. For example, in one of the tapes played for the jury, Lokey stated: "Well I just went by there and he's kinda being a stick in the mud. Said there was a problem with small sizes, I didn't do it." Coulter testified that Lokey was explaining that one of their sources "would not sell less than a bale at a time, which were around 16 pounds apiece." The jury could reasonably infer that all of Coulter's distributors, including Lokey, Stutevoss, and Davis, relied on each

---

**2.** This issue was preserved by Lokey's objections at trial and motion in limine which requested that the Court order the prosecution and all witnesses

> to refrain from any mention of ... [a]ny suggestion that the conspiracy charged in the

indictment existed before the starting date pled in the indictment, 'on or about February 1987'; such suggestion would amount to an attempt to enlarge on the indictment and would deny Defendant's rights to Due Process and notice.

other's purchases to enable Coulter to buy in bulk quantities at bulk prices.

In *Blumenthal v. United States,* 332 U.S. 539, 559, 68 S.Ct. 248, 257, 92 L.Ed. 154 (1947) the Supreme Court held that although salesmen sold only parts of illegal shipments of whiskey, each was guilty of participating in a single conspiracy because each salesman "knew the lot to be sold was larger and thus that he was aiding in a larger plan." Here, the jury could reasonably have concluded that each appellant knew that the lot of marijuana to be sold by Coulter was larger than the individual purchases each made; and thus, that each was aiding in a larger plan. For example, Coulter testified that Lokey was living with him when a 105 pound load of "cinder block" marijuana was delivered to his house and that of this load, Lokey sold 65 pounds. Coulter also testified that when this load came in, he informed Stutevoss that "the cinder blocks" were back, that Stutevoss came to his house to purchase 12 pounds, and that he tried to pick out "some really good ones" for Stutevoss. Additionally, Erkkila estimated that Davis purchased from him (Erkkila) between 100 to 150 pounds of the 300 pounds of marijuana Davis transported for him between February 1987 and May 1989. There is sufficient evidence to support the jury's verdict that appellants were part of a single conspiracy.

As noted, and even assuming arguendo that a different conspiracy was proven, Lokey and Stutevoss, in order to obtain reversal, would still have to show that the variance affected their substantial rights. In *Kotteakos,* the government admitted that more than one conspiracy was proven, but argued that the variance was not prejudicial. 328 U.S. at 756, 66 S.Ct. at 1243. As also noted, "our concern is whether the indictment, assuming it has otherwise alleged the elements of the offense, has so informed a defendant that he can prepare his defense without surprise and has protected him against a second prosecution for the same offenses." *Cochran,* 697 F.2d at 604 (citing *Hall,* 632 F.2d at 504). The defendants were apprised of the offense charged and were not surprised at trial. Nor were the convictions based upon a

"'set of facts distinctly different from that set forth in the indictment.'" *Chandler,* 858 F.2d at 257 (quoting *Young,* 730 F.2d at 223).

### 3.

Lokey, Stutevoss, and Davis contend that the district court erred in permitting evidence of similar crimes which were beyond the temporal scope of the conspiracy and substantive counts of the indictment. They maintain that its prejudicial effect far outweighed its probative value. Included in this contention is the claim that the district court erred (1) in admitting evidence of prior acts of misconduct which were extraneous to the conspiracy alleged in the indictment in that the prior acts, if committed at all, were committed by codefendants, and (2) in failing to instruct the jury to consider evidence of these prior acts only against those who committed them.

The evidence included testimony by several witnesses concerning drug deals consummated prior to February 1987. Such evidence was not extrinsic to the conspiracy charged, because it was relevant to establish how the conspiracy came about, how it was structured, and how each appellant became a member. *See United States v. Nichols,* 750 F.2d 1260, 1264–65 (5th Cir.1985). In *Nichols,* we held that "[e]vidence of the establishment of the conspiracy, identity of the participants, and execution of the scheme was a legitimate part of the government's proof in establishing the conspiracies charged." *Id.* at 1265.

But assuming arguendo that the evidence was extrinsic, it was properly admitted under Fed.R.Evid. 404(b), which provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

This rule calls for a two-step test: "First, it must be determined that the extrinsic of-

fense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of rule 403." *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979).

■■■■ The admission of evidence must be upheld unless the district court clearly abused its discretion. *United States v. Fortenberry*, 919 F.2d 923, 925 (5th Cir. 1990), *cert. denied*, — U.S. ——, 111 S.Ct. 1333, 113 L.Ed.2d 265 (1991). The evidence of the transactions occurring before the time frame alleged in the indictment was relevant for purposes other than to show criminal character; as permitted by Rule 404(b), it was relevant to show the formation of the conspiracy and its operating procedures. Furthermore, consistent with Rule 404(b), evidence of acts prior to February of 1987 was relevant to establish appellants' knowledge of the conspiracy and their intent to engage in the transactions listed in the time frame of the conspiracy.

■■■■ If extrinsic acts are relevant, the next question is whether their probative value is substantially outweighed by undue prejudice. *Beechum*, 582 F.2d at 911. "Whether the extrinsic offense is sufficiently similar in its physical elements so that the probative value is not substantially outweighed by its undue prejudice is a matter within the sound discretion of the trial judge." *Id.* at 915. As stated, the district court determined that the evidence was not extrinsic, and therefore did not apply 404(b). The probity of the evidence is,

however, clear; the evidence established the formation of the conspiracy, its operating procedures, as well as the intent of the conspirators. Any prejudice was outweighed by this probative value. Moreover, the court gave a limiting instruction on the use of similar act evidence.[3]

■■■■ Davis' contention that the prior acts of codefendants were not relevant to him and that the limiting instruction presented additional prejudice to him is also without merit. Davis maintains that the jury should have been instructed that "the evidence [could] be considered, if at all, against the codefendants but not as to Davis." Although it does not appear that Davis even requested this instruction, such an instruction would not comport with the law of conspiracy. As noted, the evidence of prior acts was necessary to establish each defendant's role in the conspiracy. " '[T]he declarations and acts of the various members, even though made or done prior to the adherence of some to the conspiracy become admissible against all as declarations or acts of co-conspirators in aid of the conspiracy.' " *Cochran*, 697 F.2d at 604 (quoting *United States v. Torres*, 685 F.2d 921, 926 (5th Cir.1982)). For example, Erkkila's testimony that, prior to 1987, his main source was Siegel, and that Siegel turned his business over to Coulter, is relevant to show how Davis, Erkkila's driver, came to deal with Coulter.

### B.

Lokey and Stutevoss challenge the sufficiency of the evidence on two bases: improper aggregation of the amount of marijuana to prove possession with intent to distribute (count 2) and their being mem-

---

3. The court instructed:

During the course of this trial, you have heard evidence of acts of the Defendant, which may be similar to those charged in the Indictment, but which were committed on other occasions. You must not consider any of this evidence in deciding if the Defendant committed the acts charged in the Indictment. However, you may consider this evidence for other very limited purposes.

You may consider evidence of the similar acts allegedly committed on other occasions to determine:

Whether a defendant had the state of mind or intent necessary to commit a crime charged in the Indictment; or whether a defendant had a motive or the opportunity to commit the acts charged in the Indictment; or whether a defendant acted according to a plan or made preparations; or whether a defendant committed the acts for which he or she is on trial by accident or mistake.

These are the limited purposes for which any evidence of other similar acts may be considered.

bers of the conspiracy (count 1). The well-known standard of review for sufficiency of the evidence is "whether, viewing the case in the light most favorable to the government, a rational trier of fact could have found from the evidence and inferences drawn therefrom that the defendant was guilty beyond a reasonable doubt." *United States v. Simmons*, 918 F.2d 476, 483 (5th Cir.1990) (citing *United States v. Matt*, 838 F.2d 1356, 1358 (5th Cir.), *cert. denied*, 486 U.S. 1035, 108 S.Ct. 2020, 100 L.Ed.2d 607 (1988)).

### 1.

■ Lokey and Stutevoss contend that for count 2 (possession with intent to distribute more than 100 kilograms of marijuana), it was improper to aggregate the amount of marijuana they possessed throughout the period listed in the indictment.

"It is unlawful for any person "knowingly or intentionally ... to ... possess with intent to ... distribute ... a controlled substance." 21 U.S.C. 841(a)(1). "[Q]uantity is not an element of the crimes proscribed by §§ 841(a)(1) and 846 [conspiracy] and need only be proven when the Government seeks an enhanced penalty." *United States v. Morgan*, 835 F.2d 79, 81 (5th Cir.1987) (citing *United States v. Gibbs*, 813 F.2d 596, 598–601 (3d Cir.), *cert. denied*, 484 U.S. 822, 108 S.Ct. 83, 98 L.Ed.2d 45 (1987)). Quantity is relevant only in determining the proper sentence under § 841(b).

Section 841(b) provides mandatory minimum and maximum penalties for violations involving specified quantities of specified drugs. Section 841(b)(1)(A)(vii) sets a mandatory minimum penalty for possession with intent to distribute 1000 or more kilograms of marijuana. Section 841(b)(1)(B)(vii) fixes the mandatory minimum penalty for possessing with intent to distribute 100 to 999 kilograms of marijuana at 5 years. And, § 841(b)(1)(D) sets the mandatory maximum penalty for possessing less than 50 kilograms of marijuana at 5 years. Stutevoss' sentence on count 2, 60 months (5 years) imprisonment, was not

affected by any of the mandatory minimum penalties in § 841(b)(1)(A). Because the evidence showed that he possessed between 150 and 180 pounds (between 68 and 82 kilograms) of marijuana during the time period set out in the indictment, he was subject to the penalties contained in § 841(b)(1)(C), which does not contain a mandatory minimum penalty. And because Stutevoss' sentence is not subject to a mandatory minimum, it was not necessary that the quantity of marijuana exceed 50 kilograms, the amount required under § 841(b)(1)(C). Furthermore, the maximum penalty for possessing less than 50 kilograms of marijuana is 5 years under § 841(b)(1)(D). Stutevoss' penalty did not exceed this maximum.

Lokey also received a 60 month sentence on count 2 and was not affected by the statutory minimum penalties in § 841(b). Because neither sentence was enhanced for amount of possession, we need not determine whether aggregation of the amounts possessed was proper.

■ Stutevoss further maintains that the district court "violat[ed] [his] Fifth Amendment right to be tried on the indictment returned by the grand jury" by instructing that Stutevoss could be convicted on count 2, if it found that he possessed with intent to distribute more than 50 but less than 100 kilograms of marijuana. This contention is also without merit. A lesser included offense need not be charged in an indictment because it is already included in the offense charged. *United States v. Martel*, 792 F.2d 630, 638 (7th Cir.1986); *see United States v. McGeehan*, 824 F.2d 677, 679 n. 2 (8th Cir.1987) (possession of less than 5 grams of LSD is a lesser included offense when distribution of 5 or more grams is charged).

### 2.

■ Lokey and Stutevoss maintain that there is insufficient evidence to show that they were members of the conspiracy charged. They contend that none of the necessary elements for proving a conspiracy, discussed in part II.A.1., were satisfied: that the conspiracy charged was not

proven to have existed, that they had no knowledge of it, and that they did not voluntarily participate in it. We disagree.

For example, the jury could have reasonably inferred that when Stutevoss was transferred from Siegel to Coulter, he knew that he was part of a larger arrangement involving some or all of Siegel's customers. Furthermore, Stutevoss was informed of the shipments of marijuana Coulter received, even though Stutevoss would only purchase a portion. The jury could reasonably infer from this that Stutevoss knew that he was a part of a larger distribution scheme. *See United States v. Mitchell,* 777 F.2d 248, 259–60 (5th Cir. 1985) (A conspiracy to distribute narcotics is a "prime example" of a conspiracy in which each member "had to have realized that the conspiracy extended beyond his individual role."), *cert. denied,* 476 U.S. 1184, 106 S.Ct. 2921, 91 L.Ed.2d 549 (1986).

Likewise, the jury could also have reasonably inferred that Lokey knew of the conspiracy and voluntarily became a member. For example, Coulter testified as to Lokey's involvement with him in a number of marijuana deals.

### C.

Lokey, Stutevoss, and Davis contend that the district court erred in overruling a motion for a mistrial after the prosecutor, during closing argument, stated that records existed, other than those introduced at trial, which showed marijuana transactions between them and Coulter.

During cross-examination of Coulter, defense counsel asked whether any evidence existed which would tend to corroborate his testimony. Coulter answered that he "did keep records" and that the "government got some of [the records]". When defense counsel asked to see them, the prosecutor stated that he had been advised that "no documents seized from [Coulter] pertain[ed] to the individuals on trial here." On the other hand, following his arrest, Coulter prepared documentation of his transactions—"a chart with totals of the marijuana, the dates, quantities, source,

[his] position, whether buyer, seller or broker, the buyer, and comments"—which was introduced at trial. During closing argument, the prosecutor stated:

> First of all, these records [prepared by Coulter after his arrest] covering that short time period say exactly what Coulter told you, and I don't see any contradictions there. But more importantly consider this, we know that there were similar records for the rest, for all other points in time that no one chose to introduce.
>
> [Defense counsel's objection sustained.]
>
> ... [T]he evidence before you was, that notes of this type were made from the beginning to the end. And don't you know if there was anything helpful in any of those notes, the Defense would have brought it to you?
>
> [Defense counsel's objection again sustained.]

The court instructed the jury to disregard these comments. But, even after this instruction, the prosecutor once again referred to the ledgers:

> [A]ll I'm saying is a suggestion has been made that ledgers exist concerning this conspiracy and that these men were not in it, and that is simply not the evidence.

And, once again, an objection was sustained. The court denied appellants' motion for mistrial. The appellants contend that the prosecutor's comments were improper, that the instructions were not curative, and that a mistrial should have been granted.

In reviewing a claim of prosecutorial misconduct in the context of closing argument, we determine "first, whether the remarks were improper, and second, whether they prejudicially affected the substantive rights of the defendant." *United States v. Parker,* 877 F.2d 327, 332 (5th Cir.), *cert. denied,* 493 U.S. 871, 110 S.Ct. 199, 107 L.Ed.2d 153 (1989). Consideration is given to "1) the magnitude of the prejudicial effect of the statements; 2) the efficacy of the cautionary instruction; and 3) the strength of the evidence of the defendant's guilt." *United States v. Iredia,* 866 F.2d 114, 117 (5th Cir.), *cert. denied,* 492

U.S. 921, 109 S.Ct. 3250, 106 L.Ed.2d 596 (1989).

■ The government responds that there were two sets of documents—notes and ledgers; that Coulter testified that some ledgers were seized; that the government stipulated that the ledgers seized did not refer to appellants, not that there were no ledgers or notes referring to appellants; and that reference to ledgers not seized or notes made was not improper. We need not reach this issue, because we find that the argument did not prejudice the appellants.

As discussed above, reversal for improper prosecutorial statements is required only where the statements cast "serious doubt on the jury's verdict." *United States v. Rocha,* 916 F.2d 219, 234 (5th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2057, 114 L.Ed.2d 462 (1991). There is none here. Obviously, the district court's on-the-scene assessment of the prejudicial effect, if any, of the remarks is entitled to considerable weight. *United States v. Hutson,* 821 F.2d 1015, 1021 (5th Cir.1987). The district court instructed the jury to disregard the remarks and determined that the motion for mistrial should be denied. In addition, the court instructed the jury at the start and conclusion of the trial that what the lawyers said was not evidence. These instructions, together with that given when the statements were made sufficiently cured any possible prejudice that might have arisen from the remarks. *See, e.g., Parker,* 877 F.2d at 327–33 (no reversible error where "immediate instruction ... to disregard the remark" was given). And, as reflected above, there was far more than sufficient evidence of appellants' guilt.

### D.

Lokey and Stutevoss urge that the district court erred in failing to instruct the jury on "the defense theory of the case"— that if multiple conspiracies existed, defendants must be found not guilty of the single conspiracy charged. Lokey's attorney requested the following instruction on isolated purchases:

You are further instructed that a sale or purchase of marijuana is not evidence that justifies a finding beyond a reasonable doubt of a conspiracy. Isolated sales or purchases of marijuana do not necessarily constitute a continuing conspiracy to distribute marijuana. Before you would be justified in finding that a conspiracy exited [sic] you must find from the evidence beyond a reasonable doubt that there was a single continuing agreement to distribute more than 200 kilograms of marijuana.

Lokey also requested the following instruction on multiple conspiracies:

You are further instructed, with regard to the alleged conspiracy offense, that proof of several separate conspiracies is not proof of the single, overall conspiracy charged in the indictment unless one of the several conspiracies which is proved is the single conspiracy which the indictment charges. What you must do is determine whether the single conspiracy charged in the indictment existed between two or more conspirators. If you find that no such conspiracy existed, then you must acquit the Defendants as to that charge. However, if you are satisfied that such a conspiracy existed, you must determine who were the members of that conspiracy.

If you find that a particular Defendant is a member of another conspiracy, not the one charged in the indictment, then you must acquit that Defendant. In other words, to find a Defendant guilty you must find that he was a member of the conspiracy charged in the indictment and not some other, separate conspiracy.

Stutevoss and Lokey maintain that the defense theory reflected in these instructions was supported by the record and that the court's failure to so instruct is reversible error.

■ It is well-established that a district court has " 'substantial latitude in tailoring [its] instructions' ". *United States v. Terrazas–Carrasco,* 861 F.2d 93, 95 (5th Cir. 1988) (quoting *United States v. Kimmel,* 777 F.2d 290, 293 (5th Cir.1985), *cert. denied,* 476 U.S. 1104, 106 S.Ct. 1947, 90

L.Ed.2d 357 (1986)). Refusal to give a particular instruction is reviewed only for abuse of discretion. *Id.*

■ The district court did not abuse its discretion in refusing to give the requested instructions. Its instructions on conspiracy covered the applicable law and did not hinder the appellants from presenting their defenses. Those instructions were based on Pattern Jury Instructions. *See* Fifth Circuit Pattern Jury Instructions, 2.21, 2.22 (West 1990). As quoted in part in section II.A.1., the court charged:

> Specifically, Count One alleges that beginning on or about February, 1987, and continuing until on or about May 3rd, 1989, in the Western District of Texas, each Defendant unlawfully, willfully and knowingly conspired to distribute more than 100 kilograms [of] marijuana.... In your consideration of the conspiracy offense as alleged in the Indictment, you should first determine from all of the testimony and evidence in the case whether or not the conspiracy existed as charged.... You must determine whether the conspiracy charged in the Indictment existed and, if it did, whether the Defendant was a member of it. If you find that the conspiracy charged did not exist, then you must return a not guilty verdict, even though you find that some other conspiracy existed.

This more than adequately presented the defense theory of the case.

### E.

Concerning sentencing, Lokey challenges the district court's finding on relevant conduct; and, he and Stutevoss assert that they were only minor participants.

### 1.

Lokey maintains that the district court, for sentencing purposes, erred in adopting the presentence investigation report's (PSI) calculation of the amount of marijuana for which he was responsible because the amounts aggregated in the report (1) were not part of the same course of conduct or common scheme or plan so as to constitute "relevant conduct" pursuant to § 1B1.3 of the sentencing guidelines and (2) were the

result of substantive offenses barred by the statute of limitations.

■ In a case involving a controlled substance, the sentence is based not only on the amount involved in the offense for which the defendant was convicted, but also on that involved in "acts ... that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). " '[T]he guidelines make clear that in drug distribution cases quantities of drugs not specified in the count of conviction are to be included in determining the base offense level if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction.' " *United States v. Thomas,* 932 F.2d 1085, 1091 (5th Cir.) (quoting *United States v. Byrd,* 898 F.2d 450, 452 (5th Cir.1990), *cert. denied,* — U.S. —, 112 S.Ct. 75, — L.Ed.2d — (1991)). While this court has determined that conduct that is part of the same conspiracy is "relevant conduct" under § 1B1.3, we have left open the issue of whether a district court's determination that certain transactions were part of the conspiracy for which an appellant was convicted is subject to review under the "clearly erroneous" test. *United States v. Woolford,* 896 F.2d 99, 104 n. 7 (5th Cir.1990).

However, other circuits that have addressed the issue have held that the clearly erroneous standard is the proper standard of review. *See United States v. Vazzano,* 906 F.2d 879, 883 (2d Cir.1990) ("[A] determination of whether conduct is relevant to the offense of conviction is reviewed under the clearly erroneous test."); *United States v. Gooden,* 892 F.2d 725, 728 (8th Cir.1989), *cert. denied sub nom. Keener v. United States,* — U.S. —, 110 S.Ct. 2594, 110 L.Ed.2d 274 (1990) (a finding by district court that sale of cocaine was part of same course of conduct is a factual determination subject to the clearly erroneous standard of review); *United States v. Mocciola,* 891 F.2d 13, 16 (1st Cir.1989) ("Under our deferential standard of review, whether uncharged drugs are part of a common scheme or plan is a factual finding we will disturb only if clearly erroneous."). We agree with these circuits. Because the district court is obviously in the best posi-

tion to determine what constitutes relevant conduct, we review its finding of relevant conduct for clear error. *See United States v. Mir*, 919 F.2d 940, 943 (5th Cir.1990) (whether defendant is an organizer, leader, manager, or supervisor of criminal activity is a factual finding); *United States v. Barreto*, 871 F.2d 511, 513 (5th Cir.1989) (whether a defendant has accepted responsibility is a question of fact); *United States v. Thomas*, 870 F.2d 174, 176 (5th Cir.1989) (whether a conspiracy is capable of producing a certain amount of cocaine is a factual question).

In determining Lokey's sentence, the district court included all of Lokey's drug transactions from 1984 to 1989, including two transactions totalling 1450 pounds consummated in 1984, because they were part of the same conspiracy for which he was convicted. *Woolford*, 896 F.2d at 104 (transactions that are part of the same conspiracy fall within § 1B1.3).

 Lokey maintains that the district court disregarded the fact that he moved to Garland, Texas in 1985 and that while there, he "had no dealings with Coulter or Mihalik." However, the 2000–pound amount used in the PSI was derived by aggregating only sales in which Lokey was personally involved. Furthermore, with regard to the time Lokey spent in Garland, a single conspiracy is not converted into multiple conspiracies "simply by lapse of time, change in membership, or a shifting emphasis in the locale of the operation." *De-Varona*, 872 F.2d at 119. "[A] single conspiracy can involve one pivotal figure [in this instance, Coulter,] who directs illegal activities while various combinations of other defendants further those activities in different ways and at different times." *Id.* "A single conspiracy finding does not require every member to participate in every transaction." *Id.* The finding that the amounts of marijuana aggregated for sentencing purposes were part of the same course of conduct or common scheme or plan is not clearly erroneous.

 Concerning Lokey's contention that the pre–1984 transactions were time-

barred, we note that the five-year limitations period for prosecuting the two marijuana transactions in 1984 did not expire until the fall of 1989. At the time of Lokey's arrest and indictment, the statute of limitations had not run. In any event, § 1B1.3(a)(2) does not limit acts that are "part of the same course of conduct or scheme or plan" to the period covered by the statute of limitations.

### 2.

 Lokey and Stutevoss contend that the district court's denial of a two-level downward adjustment for "minor role in the offense" was clearly erroneous.[4] Under § 3B1.2(b), a district court must reduce an offense level by two if it finds that the defendant was a "minor participant" in the offense for which he was convicted. A defendant cannot be considered a minor participant unless he is "substantially less culpable than the average participant." U.S.S.G. § 3B1.2, app. note 3. Whether they played only minor roles in the conspiracy is a factual determination which must be upheld unless it is clearly erroneous. *United States v. Giraldo–Lara*, 919 F.2d 19, 22 (5th Cir.1990).

Stutevoss was a regular customer of Coulter throughout the period listed in the indictment, purchasing between 150 and 180 pounds of marijuana in increments of three to twelve pounds. And, Lokey was involved in transactions involving a total of at least 2000 pounds of marijuana. The finding that each was not "substantially less culpable" than his co-conspirators was not clearly erroneous. Therefore, the district court did not err in refusing to reduce the sentences of Lokey and Stutevoss under § 3B1.2(b).

### III.

Accordingly, the judgments are AFFIRMED.

---

4. Both Lokey and Stutevoss preserved this issue for appeal; their objections to the PSI, including

at the sentencing hearing, reflect that they claimed minor participant status.