Revised September 16, 1998

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 97-50427
_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

MARTIN GONZALEZ MUNOZ,

Defendant - Appellant

_____

Appeal from the United States District Court
for the Western District of Texas
_____

August 4, 1998

Before KING, DAVIS, Circuit Judges, and HEARTFIELD, District Judge.[1]

Appellant, Martin Gonzalez Munoz, was convicted of being a felon in possession of a firearm and was sentenced. Finding no reversible error, we affirm.

I

A

Munoz, a convicted felon, moved into an apartment located at 11625 Rojas in El Paso, Texas, with his girlfriend, Brandi Reinhardt, and her baby during March, 1995. He contacted his parole officer, Carlos G. Paniagua, about his new home address. Paniagua verified Munoz's change in residence through Reinhardt.

---

[1] District Judge of the Eastern District of Texas, sitting by designation.

Munoz met Richard Mason about this time. Mason expressed a desire to sell a .45 caliber Llama pistol for $280.00. Munoz offered to buy the gun. When asked by Mason if he was a convicted felon, he answered, "No, I'm not on parole." This assurance received, Mason agreed to sell. He and Munoz went to the Rojas apartment to complete the transaction. Once there, Reinhardt gave Munoz $80.00 and promised to pay the remaining $200.00 later. During the sale, Mason saw a sawed-off shotgun leaning against a corner.

Munoz related to Wayne Richard Mullins, Reinhardt's brother-in-law, on May 7, 1995, that he had received a .45 caliber gun from Reinhardt for his birthday (May 5). On separate occasions, he informed Maria Telles and Lisa Wheeler, friends of Reinhardt, that Reinhardt had given him the pistol for his birthday and demonstrated how to use it.[2]

Telles and Wheeler each observed a sawed-off shotgun in the Rojas apartment while Munoz was residing there. Telles noticed the weapon leaning against a wall in the living room near the sofa. Wheeler saw it in several different places and witnessed Munoz handling it. Munoz told both Telles and Wheeler that the sawed-off shotgun belonged to him.

Munoz left the Rojas apartment on May 29, 1995, after arguing with Reinhardt. About this time, Reinhardt took the pistol, a clip and a red bag containing bullets to the home of her mother, Charlotte Norville, and hid them.

A state arrest warrant for a parole violation (blue warrant) was issued for Munoz on June 7, 1995. A week later, Willie Gonzalez, a state parole officer, contacted Deputy United States Marshal Fernando Karl of the Southwest Fugitive Taskforce (Taskforce) about Munoz. He said Munoz was living in an apartment on Rojas, that he had no information of Munoz being employed

---

[2] Munoz made his disclosure to Telles, who lived next door to him, in May, 1995.

and that Munoz was, in all likelihood, armed. According to Gonzalez, Telles, whose identity he did not divulge, was willing to help apprehend Munoz.

Karl proceeded to obtain Munoz's criminal history. The National Criminal Information Center (NCIC) reported numerous convictions, including some for felonies, and an outstanding blue warrant dated June 7, 1995. Karl conveyed what he had learned from Gonzalez and NCIC to Taskforce members. They decided to execute the blue warrant early in the morning because of safety concerns and their expectation that Munoz, given his apparent unemployed status, would be home.

Taskforce members arrived at the Rojas apartment about 5:00 a.m. on June 15, 1995. Telles told them that Munoz had gone into the apartment around 2:00 a.m. and, as far as she knew, was still there. She also said he had failed to respond when the police had come for him previously.

Taskforce members approached the apartment. They noticed the front window's curtains drawn and heard music.

One agent knocked on the door and announced, "Police, federal officers, open the door." He continued for about ten minutes. Believing Munoz to be inside, Taskforce members obtained a key to the apartment, opened the door, entered and made a quick security sweep. Based upon his previous experience discovering suspects behind, inside and under sofas, one of the Taskforce members, Deputy United States Marshal Fernando Payan, moved the sofa in the living room away from the wall as part of this investigation. He saw a sawed-off shotgun upon doing so. Taskforce members confiscated it. Neither Munoz nor anyone else was found in the Rojas apartment.

Munoz and Reinhardt, having reconciled, were married later on June 15. They went to a Travelers Inn on Gateway West in El Paso afterward.

Telles alerted the Taskforce about 8:00 p.m. that Reinhardt, who, she said, was driving a primer gray 1980 Malibu, was meeting Munoz at a Motel 6. Taskforce members checked two Motel 6's on the east side of El Paso for Munoz without success. As they were discussing what to do next, they observed a primer gray Malibu traveling west on Gateway East. They tailed the car to the Travelers Inn on Gateway West. After confirming Munoz's registration, one of them telephoned his room and, identifying himself as the manager, stated that additional paperwork needed to be signed. This communication induced the opening of the room's door. At that point, two Taskforce members entered, located Munoz and arrested him. (Around 10:30 p.m., Norville informed Armando Salas, a Special Agent with the United States Bureau of Alcohol, Tobacco and Firearms (ATF), that Munoz and Reinhardt had gone to the Travelers Inn, and turned over the pistol, clip and bullets to him. For whatever reason, the Taskforce members in the field never knew about this development.)

B

A three-count indictment was returned against Munoz on January 17, 1996. Count I charged him with knowing possession of an unregistered firearm, the sawed-off shotgun, in violation of 26 U.S.C.§ 5861(d). Count II accused him of being a convicted felon in possession of a firearm, the sawed-off shotgun, in violation of 18 U.S.C. § 922(g)(1), while count III alleged the same offense as to the pistol. Both of the latter counts stated that Munoz had "been convicted of a crime punishable by imprisonment for a term exceeding one year, namely for the felony offense of Aggravated Robbery in Cause No. 50474-65 in the 65th District Court of El Paso, Texas." See generally Tex. Penal Code Ann. § 29.03 (West 1998).

4

The trial judge granted Munoz's motions in limine covering "[a]ny extraneous offense allegedly committed by the Defendant" and "[t]he details of any offense used to establish the conviction of the Defendant" on March 17, 1997. Prior to this ruling, Munoz, through his counsel, Charles Roberts, had stated that these requests were made in anticipation of a stipulation to his status as a convicted felon.

Voir dire began after motions in limine were resolved. The trial judge read the indictment, including passages relating Munoz's earlier felony conviction for aggravated robbery. He later asked if any venire member "believe[d] that the federal government should not make any laws affecting the ownership, possession or use of firearms," which precipitated the following colloquy:

THE COURT: Do you think anybody should be able to bear arms, even people that have been convicted of an Offense?

[VENIRE MEMBER]: Depends on what the offense is, I guess.

THE COURT: Well, in this case you've heard it's aggravated robbery. Now does that--is that going to affect you or can you still sit on this jury?

[VENIRE MEMBER]: I think I can still sit on the jury.

At the end of voir dire, Munoz sought a mistrial because the trial judge had disclosed the aggravated robbery to the venire panel. The motion was denied. Nobody ever specified Munoz's earlier felony conviction during trial; the Government and Munoz eventually filed a stipulation stating that "the defendant has been convicted in a court of a crime punishable by imprisonment for a term in excess of one year, that is a felony offense, prior to the time periods specified in the indictment."

Once the jury was impaneled, the trial judge delivered preliminary instructions to its members. Among other things, he told them, "Nothing I may say or do during the course of this trial is

intended to indicate, nor should it be taken by you as indicating what your verdict should be." He

also said, "Statements, arguments, and questions by the lawyers are not evidence." He concluded

with the following charge:

> Ladies and gentlemen, before the attorneys address you, I'm going to instruct you on just one matter. You are instructed that at this time, you are not to consider the specific offense of which the Defendant has been convicted. You're not to consider this for any purpose. What we are here on has nothing to do with what he's been convicted of except as it relates to the accusation of the firearm.
>
> So we're not concerned with what may have happened before in another case, except in how it relates to this firearm--to this allegation of a firearm.

Trial then started and continued over the next few days. The Government's case included

testimony by Mason, Mullins, Telles and Wheeler about their respective experiences with Munoz.

Salas identified the sawed-off shot gun seized from the Rojas apartment as "a 12-gauge" and

reported the weapon's barrel length as 17 3/4 inches.

Munoz eventually took the stand. At the outset, he gave June 3, 1995, as the date on which

he moved into the Rojas apartment, but later changed it to February 3, 1995. Despite this

correction, the trial judge remained unclear about which day Munoz had started to live at the

Rojas apartment, a circumstance that led to the following discussion when Munoz denied being

there after May 29, 1996:

THE COURT: From what days, again?

[MUNOZ]. May 29th, 1995, to June 15th, 1995, the date I was arrested, Your Honor.

THE COURT: I'm confused. You testified earlier--and I'll tell you what you said.

> "Okay. Now, Mr. Munoz, when did you start living with Brandi Munoz, who's the lady-- we'll say Brandi Reinhardt.
>
> "The specific date was on June 3rd, 1995.

6

"That's when you started living with her?

"Yes, sir. She'd stay--prior to that--she'd stay at my apartment."

[MUNOZ]. May I say something, Your Honor?

THE COURT: Yes, sir.

[MUNOZ]. If I said that, I mean, I--it was incorrect. I made a mistake. The reason I know it was February 3rd, sir, is because that day I turned in my apartment where I was living at.

THE COURT: And then you stated, "'Okay. And that was at San'"--whatever address it was.

[MUNOZ]. San Jose.

THE COURT: "Now, when did you-all live at the Rojas address?

"During that period. That was the apartment I moved in with her to, on June 3rd."

Now, that's what you testified to earlier, sir.

MR. ROBERTS: Your Honor, he--I would object to the Court's cross-examination.

THE COURT: No, I'm just trying to clear it up, Mr. Roberts. I have every right to.

MR. ROBERTS: He's already said that he was confused, Your Honor. He meant February 3rd.

THE COURT: Well, I'm confused.

[MUNOZ]. The correct day, Your Honor, is February 3rd. That date I turned in my apartment and moved in with her. I'm sorry if I--I'm thinking in relations to June, because that was the month I was arrested.

THE COURT: Go ahead

The trial judge made no similar inquiries of Munoz or anyone else during the trial.

Munoz's defense centered on portraying Mason, Mullins, Norville, Telles and Wheeler as liars.

He claimed that Mason had given a false account of their relationship because he had told him to

stop making sexual advances toward Reinhardt and because the Government had granted him

7

immunity from prosecution for selling a weapon to a convicted felon.[3]  He also maintained that

Telles and Wheeler had lied because of animosity toward him, a contention that sparked the

following exchange with the prosecutor, Assistant United States Attorney Donna Miller:

Q. And is it further your opinion, then, and your testimony, that because of this attitude against you by Ms. Wheeler and Ms. Telles, that they have been willing--that that attitude is so strong, they feel so strongly against you, that they've carried this with them for the past two years, have subjected themselves, in some instances, to testimony, sworn testimony before the Grand Jury, and in some instances--sworn testimony before this Court--

MR. ROBERTS: Your Honor, she's testifying outside of the record.  I would object at this point.

THE COURT: Keep it shorter, Ms. Miller.

MS. MILLER: I'm sorry, Your Honor.

THE COURT: Overruled.

After the close of evidence, the trial judge charged the jury.  His instructions included the

following:

Remember that any statements, objections, or arguments made by the lawyers are not evidence.  The function of the lawyers is to point out those things that are most significant or most helpful to their side of the case, and in so doing to call your attention to certain facts or inferences that might otherwise escape your notice.  Also, do not assume anything I may have done or said during the trial, as stating that I have any opinion concerning any of the issues in this case.  Except for the instructions to you on the law, you should disregard anything I might have said during the trial in arriving at your own findings as to the facts.

In the final analysis, however, it is your own recollection and interpretation of the evidence that controls in this case.  What the lawyers say is not binding on you.

. . . .

Members of the Jury, you are not to consider the underlying felony conviction for any purpose in your deliberations.  You are only to consider that the defendant has stipulated that

---

[3] At some point, Mason had discovered that Munoz was on parole and had then notified the ATF of his sale of the pistol to Munoz.

he has been convicted in a court of law of a crime punishable by imprisonment for a term in excess of one year, that is a felony offense, prior to the time periods specified in the indictment.

The jury charge also incorporated a copy of the indictment with the mentions of the previous aggravated robbery conviction redacted. Finally, the jury was instructed, as to each count in the indictment, that guilt could rest on a finding of either actual or constructive possession of whatever firearm was involved.

Miller and Roberts presented their closing arguments after the jury was charged. In her statement, Miller responded to Munoz's theory that Mason, Mullins, Norville, Telles and Wheeler had fabricated their testimony. She stressed the threat of perjury charges as assuring the truthfulness of these witnesses. For example, she made the following assertion about the credibility of Mullins and Norville:

> Mr. Munoz was not able to articulate a reason why he felt Mr. Mullins and Ms. Norville might be willing to submit themselves to the charges of perjury, willing to come here before you yesterday and take an oath before this Court, sit there, be questioned by the Government, then cross-examined by Mr. Roberts.

The jury retired to deliberate after closing arguments. At one point, it sent a note asking, "This shotgun (Government Exhibit 2) shows 20 GA. On page 14 and page 15 of the instructions they say 12 gauge, does that matter?"[4] The trial judge replied, "For purposes of rendering your verdict, any marking on the exhibit that may or may not indicate what gauge the shotgun is, do not matter." The jury eventually found Munoz guilty of the two felon-in-possession charges, but acquitted him of the charge of possessing an unregistered firearm.

---

[4] Pages 14 and 15 of the jury instructions delineated the elements of the offenses charged in counts I and II of the indictment.

9

Munoz was sentenced following his conviction. The presentence investigation report (PSR) set his base offense level at 34. Given that he had 2 earlier aggravated robbery convictions and 3 prior drug offense convictions, it placed him in criminal history category VI based on seventeen criminal history points (3 points for each conviction plus 2 points for committing the instant offense while on parole) and, alternatively, on § 4B1.4(c)(2) of the United States Sentencing Guidelines, the armed career criminal enhancement provision.[5] At the sentencing hearing, the criminal history point total was reduced to eleven when the trial judge agreed to count the 3 drug offense convictions as 1 conviction. This adjustment triggered the following discussion:

> THE COURT: . . . For the record, I've ruled that he has five points plus 2 for a total of 11; Criminal History Category V; level 34; possible sentence 262--I'm sorry, 235 to 293 months; possible fine, although not very likely.

> MS. MILLER: Your, Honor, I just--I hate to interrupt the Court, but the Court indicated that given the number of criminal history points that he's at a Criminal History Category of V; is that correct?

> THE COURT: Right.

> MS. MILLER: But as a career--I think both as a career offender and as an armed career criminal, he's going to be a VI no matter what.

> THE COURT: That's right. I stand corrected.

>   That's right Mr. Roberts.

>   Guidelines 4B1.1, "Career offender's criminal history category in every case shall be Category VI."

> MR. ROBERTS: Well, I stand corrected, Your Honor.

---

[5] The PSR reported a third aggravated robbery conviction but assigned no criminal history points for this offense.

The trial judge sentenced Munoz to two concurrent prison terms of 262 months, two concurrent three year terms of supervised release following imprisonment and two special assessments of $100.00 each. He "adopt[ed] the factual findings and guideline application in the presentence report" in the judgment rendering this punishment.

After sentencing, Munoz filed a timely appeal challenging the seizure of the sawed-off shotgun, certain rulings and conduct during trial, the jury's verdict and his sentence.

II

Munoz characterizes the seizure of the sawed-off shotgun as violative of the Fourth Amendment. The trial judge rejected this view following a suppression hearing.

We review findings of fact rendered after a suppression hearing for clear error and conclusions of law de novo. See United States v. Gonzales, 121 F.3d 928, 938 (5th Cir. 1997), cert. denied, ___ U.S. ___, 118 S. Ct. 726, 139 L. Ed. 2d 664 (1998), and cert. denied, ___ U.S. ___, 118 S. Ct. 1084, 140 L. Ed. 2d 141 (1998). We view the evidence in the light most favorable to the party that prevailed--the Government here--and consider both evidence offered at the suppression hearing and admitted at trial. See id.

Law enforcement officers may seize anything they find in plain view without a search warrant. See Minnesota v. Dickerson, 508 U.S. 366, 375, 113 S. Ct. 2130, 2136-37, 124 L. Ed. 2d 334, ___ (1993). An object falls within plain view if law enforcement officers are lawfully in a position from which they view it, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to it. See id.

One situation falling within the plain view doctrine involves the seizure of contraband while searching the home of a suspect subject to a valid arrest warrant. See Maryland v. Buie, 494 U.S.

11

325, 330, 110 S. Ct. 1093, 1096, 108 L. Ed. 2d 276, ___ (1990); United States v. Woods, 560 F.2d 660, 663-67 (5th Cir. 1977), cert. denied, 435 U.S. 906, 98 S. Ct. 1452, 55 L. Ed. 2d 497 (1978); 3 Wayne R. LaFave, Search and Seizure §§ 6.3(a), 6.7 (3d ed. 1996 & Supp. 1998).  In this case, the law enforcement officers go into the residence based on a reasonable belief that the suspect is there and an arrest warrant founded on probable cause.[6]  See Payton v. New York, 445 U.S. 573, 602-03, 100 S. Ct. 1371, 1388, 63 L. Ed. 2d 639, ___ (1980); United States v. Route, 104 F.3d 59, 62 (5th Cir.), cert. denied, ___ U.S. ___, 117 S. Ct. 2491, 138 L. Ed. 2d 998 (1997).  After entering, they begin to search for the suspect.  This effort sometimes necessitates looking in places where the suspect might be hiding.  See Buie, 494 U.S. at 332-33, 110 S. Ct. at 1097, 108 L. Ed. 2d at ___.  In the process, they come across an obviously incriminating object-- that is, an object they "have probable cause to believe is either evidence of a crime or contraband," United States v. Buchanan, 70 F.3d 818, 826 (5th Cir. 1995), cert. denied, 517 U.S. 1114, 116 S. Ct. 1340, 134 L. Ed. 2d 490 (1996).  See Woods, 560 F.2d at 664, 666.  Since the arrest warrant places them in a lawful position to view the incriminating object--by  authorizing their presence in the residence--and the search for the suspect in places where he might be hiding establishes their lawful right of access to it, they can seize it without a search warrant.  See id. at 664-67; see also United States v. Wells, 98 F.3d 808, 810 (4th Cir. 1996) (applying the plain view doctrine); Brayman v. United States, 96 F.3d 1061, 1065 (8th Cir. 1996) (same).

---

[6] The arrest warrant need not pertain to the crime with which the suspect is later charged. See United States v. Buckner, 717 F.2d 297, 298-99, 301 (6th Cir. 1983).  Nor must law enforcement officers possess the warrant; they must only have reliable knowledge of it. See Fed. R. Crim. P. 4(d)(3); Buckner, 717 F.2d at 301.

The confiscation of the sawed-off shotgun fits this scenario. The time of day, Munoz's apparent unemployed status, Telles' report and the sound of music inside the Rojas apartment caused the Taskforce members reasonably to believe Munoz was home. See Route, 104 F.3d at 62-63 (effort to determine if suspect resided at home, the sound of a television inside and the presence of a car in the driveway demonstrated reasonable belief); Woods, 569 F.2d at 665 ("we find it a reasonable anticipation on the officers' part to believe that a person would be at his place of abode, especially at 8:30 in the morning for a man not known to be working"). Through NCIC, they also knew of an outstanding blue warrant for him.[7] See generally United States v. McDonald, 606 F.2d 552, 553-54 (5th Cir. 1979) ("the cases uniformly recognize that NCIC printouts are reliable enough to form the basis for the reasonable belief which is needed to establish probable cause for arrest"). These circumstances sanctioned going into the apartment. Once inside, the Taskforce members were entitled to search anywhere Munoz might have been hiding. Pushing the sofa in the living room away from the wall fell within the scope of this investigation, given that suspects were known to have secreted themselves behind, inside and under sofas.[8] Cf. United States v. Lauter, 57 F.3d 212, 213-14, 216-17 (2d Cir. 1995) (upholding

_____

[7] Munoz's assertion that the Government must show the blue warrant to be based upon probable cause possesses no merit. He bears the burden of exposing the warrant as invalid. See United States v. De La Fuente, 548 F.2d 528, 533-34 (5th Cir.), cert. denied, 431 U.S. 932, 97 S. Ct. 2640, 53 L. Ed. 2d 249 (1977), and cert. denied, 434 U.S. 595, 98 S. Ct. 479, 54 L. Ed. 2d 312 (1977); see also Buckner, 717 F.2d at 301. And he fails to point to any evidence creating doubt about its validity.

[8] Munoz challenges the search of the sofa because "[i]t is difficult to imagine that a 5' 9", 240-pound person [such as himself] could hide between a couch and the wall, or underneath a couch without some articulable fact to suspect his presence." Even if this contention is correct, the fact remains that Taskforce members needed to move the sofa to determine if anyone was inside of it. As Payan remarked at the suppression hearing: "[O]nce you touch it and move it, you know, you can tell if a body is in there. Because if a body is inside the sofa, you're not going to

13

post-arrest protective sweep that included looking in the approximately three-foot space between the bed and the wall because "a person certainly could have been hiding in that location").  It uncovered a sawed-off shotgun, the incriminating character of which was immediately apparent because Munoz was known to be a convicted felon.  See Wells, 98 F.3d at 810 ("the evidence from the prior criminal records review indicating that [the defendant] . . . had a previous felony record was sufficient to provide probable cause to believe that the firearm constituted evidence of a § 922(g)(1) offense").  This course of events establishes the seizure of the sawed-off shotgun as constitutionally permissible.  As such, it leads us to affirm the denial of Munoz's motion to suppress.

### III

Munoz maintains that his convictions must be overturned because the trial judge disclosed the prior aggravated robbery conviction during voir dire, despite knowing Munoz's intention to stipulate to being a convicted felon.  The trial judge overruled an objection at the end of voir dire and denied a motion for new trial making this argument.[9]  Munoz asserts that these rulings contravened Old Chief v. United States, 519 U.S., 172, ___, 117 S. Ct. 644, 655, 136 L. Ed. 2d 574, ___ (1997), which held that, when the Government wishes to introduce evidence relating the nature of a defendant's prior felony conviction solely to show that he is a convicted felon and "the prior conviction is for an offense likely to support conviction [in the present case] on some improper ground, the only reasonable conclusion [is] . . . that the risk of unfair prejudice . . .

move it as easily . . . ."

[9] Munoz believes the mention of the aggravated robbery conviction requires a new trial "[b]ecause the verdict was a mixed one, and because evidence of . . . guilt was not overwhelming."

14

substantially outweigh[s] the discounted probative value of the record of the conviction" and the evidence of the prior felony conviction must be excluded under Federal Rule of Evidence 403, if the defendant offers to stipulate to having a prior felony conviction.[10]

We review the trial judge's conduct of voir dire for abuse of discretion. See United States v. Rasco, 123 F.3d 222, 231 (5th Cir. 1997), cert. denied, ___ U.S. ___, 118 S. Ct. 868, 139 L. Ed. 2d 765 (1998). If we find an abuse of discretion, then we decide whether or not it constitutes harmless error. Compare United States v. Garcia, 86 F.3d 394, 401 (5th Cir. 1996) with United States v. Brown, 897 F.2d 162, 163 (5th Cir. 1990). Harmless error is "[a]ny error, defect, irregularity or variance which does not affect substantial rights."[11] Fed. R. Crim. P. 52(a). It arises when the mistake fails to prejudice the defendant. See United States v. Olano, 507 U.S. 725, 734, 113 S. Ct. 1770, 1778, 123 L. Ed. 2d 508, ___ (1993). Prejudice occurs when the error "ha[s] affected the outcome of the district court proceedings." Id. The Government bears the burden of showing harmless error. See id.

We review the denial of a motion for new trial for abuse of discretion. See Rasco, 123 F.3d at 228. The trial judge grants a new trial only if he does not find harmless error. See id.; 3 Charles

---

[10] As this case demonstrates, Old Chief's rule can be implicated when the trial judge reads the indictment, as well as during voir dire. See Old Chief, 519 U.S. at ___ n.10, 117 S. Ct. at 655 n.10, 136 L. Ed. 2d at ___ n.10; United States v. Myles, 96 F.3d 491, 495-97 (D.C. Cir. 1996); United States v. Jones, 67 F.3d 320, 322, 324-25 & n.10 (D.C. Cir. 1995).

[11] Old Chief found an abuse of discretion, but refrained from deciding whether or not the misstep was subject to harmless error analysis. See Old Chief, 519 U.S. at ___, ___ n.11, 117 S. Ct. at 647, 656 n.11, 136 L. Ed. 2d at ___, ___ n.11. We join the chorus of circuit courts holding that a violation of Old Chief's rule necessitates reversal only when this error is not harmless. See United States v. Harris, 137 F.3d 1058, 1060 (8th Cir. 1998), petition for cert. filed, ___ U.S.L.W. ___ (U.S. June 2, 1998) (No. 97-9385); United States v. Daniel, 134 F.3d 1259, 1262-63 (6th Cir. 1998), petition for cert. filed, ___ U.S.L.W. ___ (U.S. Apr. 22, 1998) (No. 97-8889); United States v. Anaya, 117 F.3d 447, 449 (10th Cir. 1997).

Alan Wright, Federal Practice and Procedure § 551 (2d ed. 1982). He may weigh the evidence and assess the credibility of the witnesses in reviewing a motion for new trial. See United States v. Robertson, 110 F.3d 1113, 1117 (5th Cir. 1997). However, he must refrain from reweighing the evidence and setting aside the verdict simply because he feels some other result would be more reasonable. See id. at 1118. He may grant a new trial only if he finds the evidence preponderating heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand. See id.

The Government contends that these standards fail to govern here because Munoz made no timely objection to the trial judge's references to the earlier aggravated robbery conviction. This circumstance, it asserts, entitles him to nothing more than review for plain error. We may reverse for plain error only if (1) there was error (2) that was clear and obvious and (3) that affected the defendant's substantial rights. See United States v. Dupre, 117 F.3d 810, 817 (5th Cir. 1997), cert. denied, ___ U.S. ___, 118 S. Ct. 857, 139 L. Ed. 2d 756 (1998). "Normally, although perhaps not in every case, the defendant must make a specific showing of prejudice to satisfy the 'affecting substantial rights' prong . . . ." United States v. Garcia Abrego, 141 F.3d 142, 165-66 (5th Cir. 1998); see also Olano, 507 U.S. at 734, 113 S. Ct. at 1778, 123 L. Ed. 2d at ___. Even if we find plain error, "we should exercise our discretion to reverse only if the error 'seriously affects the fairness, integrity or public reputation of judicial proceedings.'" Garcia Abrego, 141 F.3d at 166.

We hold that, regardless of the standard of review, the trial judge's statements about Munoz's prior aggravated robbery conviction, even if erroneous, fail to necessitate reversal. As to voir dire, any prejudice they caused was remedied by the absence of any mention of the conviction's

16

nature during trial, the trial judge's admonition to the jury at the start of trial "not to consider the specific offense of which the Defendant has been convicted," and his instructions to the jury at the end of trial "not to consider the underlying felony conviction for any purpose" and to consider only that Munoz had stipulated to being a convicted felon. Cf. Garcia, 86 F.3d at 401-02 (curative instruction to jury remedies any prejudice arising from trial judge's comment about some defendants' nationality during voir dire); Jones, 67 F.3d 320, 322, 324-25 (D.C. Cir. 1995) (finding plain error where nature of previous conviction was disclosed seven times during trial). As to a new trial, the Government's evidence supports for the trial judges denial of Munoz's request for such relief. These circumstances preclude any failure to adhere to Old Chief from being sufficient to warrant reversal.[12]

IV

Munoz considers questions by the trial judge about when he began to live at the Rojas apartment to have rendered his trial unconstitutional. We must determine whether the trial judge's inquiry was so prejudicial that it denied Munoz a fair, as opposed to a perfect, trial. See United States v. Bermea, 30 F.3d 1539, 1569 (5th Cir. 1994), cert. denied, 514 U.S. 1097, 115 S. Ct. 1825, 131 L. Ed. 2d 746 (1995). To be constitutional error, the trial judge's statements, viewed as a whole, must have amounted to an intervention that could have led the jury to a predisposition of guilt by improperly confusing the function of judge and prosecutor. See id. The trial judge's intervention must have been quantitatively and qualitatively substantial to meet this test. See id. Our review therefore focuses on matters such as the context of the remarks, the

---

[12] Our disposition makes unnecessary consideration of whether or not aggravated robbery is sufficiently akin to being a felon in possession of a firearm to trigger Old Chief. See Old Chief, 519 U.S. at ___ n.8, 117 S. Ct. at 652 n.8, 136 L. Ed. 2d at ___ n.8.

17

person to whom they were directed, the number and nature of the questions, and the presence of curative instructions. See United States v. Saenz, 134 F.3d 697, 702 (5th Cir. 1998).

We discern no constitutional error in the trial judge's inquiry about when Munoz moved into the Rojas apartment. First, this incident was the only one of its kind during trial. Second, the trial judge stated that his questioning arose because he was "confused" and was "just trying to clear it up." See United States v. Dobbs, 63 F.3d 391, 398 (5th Cir. 1995) (trial judge may make comments and raise questions to clarify confusing issues); Bermea, 30 F.3d at 1571 (same). Third, prior to the questioning, Munoz had conceded that the date he had initially given was incorrect; so the exchange with the trial judge lacked little, if any, consequence as to his guilt or innocence. Cf. Bermea, 30 F.3d at 1571 ("in any event, the jury witnessed [the defendant's] . . . self-contradiction and to the extent it actually occurred could use that fact in assessing his credibility if it chose to do so."). Finally, the trial judge instructed the jury at both the beginning and end of trial that his comments and actions could provide no basis for the verdict. See id. at 1571-72. These circumstances foreclose the possibility that the questioning of Munoz caused the jury to confuse the trial judge's role with that of the Government. They, consequently, establish Munoz's assertion that the inquiry was unconstitutional as meritless.

V

Munoz assails certain statements by Miller during trial as prosecutorial misconduct. He objects to the prosecutrix saying, while probing his claim that Telles and Wheeler had lied, that they "have subjected themselves, in some instances, to testimony, sworn testimony before the Grand Jury." He also considers the following parts of her closing argument inappropriate:

(1) "But I'd submit to you, ladies and gentlemen, that [Mason] . . . was truthful with you."

18

(2) "We cannot, we will not, and do not present, unfortunately, perfect or blemish-free witnesses, or witnesses that are going to fabricate. . . . But I submit to you, ladies and gentlemen, that [Mason] . . . didn't [lie]."

(3) "[Mullins] . . . didn't fabricate anything. He didn't elaborate on anything. . . . He didn't make up a story about, oh, I saw him shoot the firearm. . . . He was honest with you."

(4) "[Norville] . . . told you what she knew."

(5) "I submit to you, ladies and gentlemen, you can believe the Government's witnesses . . . ."

(6) ". . . I submit [Telles and Wheeler] . . . came in to tell you the truth."

Our review of a charge of prosecutorial misconduct entails two steps. We initially decide whether or not the prosecutor made an improper remark. See United States v. Fields, 72 F.3d 1200, 1207 (5th Cir.), cert. denied, ___ U.S. ___, 117 S. Ct. 48, 136 L. Ed. 2d 13 (1996). In the context of cross-examination, no misconduct can arise from a question asked for a valid reason. See United States v. Swanson, 9 F.3d 1354, 1359 (8th Cir. 1993). In the context of closing argument, the prosecutor "may not personally vouch for the credibility of a government witness, as doing so may imply that [she] . . . has additional personal knowledge about the witness and facts that confirm the witness' testimony, or may add credence to such testimony." United States v. Washington, 44 F.3d 1271, 1278 (5th Cir.), cert. denied, 514 U.S. 1137, 115 S. Ct. 2011, 131 L. Ed. 2d 1010 (1995). But she "is not forbidden to argue that the fair inference from the facts presented is that the witness has no reason to lie." Id. (internal quotations omitted). Nor is she "prohibited from 'recit[ing] to the jury those inferences and conclusions [s]he wishes [the jury] to draw from the evidence so long as those inferences are grounded upon evidence.'" Id. She "may even present what amounts to be a bolstering argument if it is specifically done in rebuttal to

19

assertions made by defense counsel in order to remove any stigma cast upon [her] . . . or [her] . . . witnesses." United States v. Dorr, 636 F.2d 117, 120 (5th Cir. Unit A Feb. 1981).

If we find that the prosecutor made an inappropriate comment, then we consider whether or not it prejudiced the defendant's substantive rights. See Fields, 72 F.3d at 1207. We reverse only if the remark "taken as a whole in the context of the entire case, prejudicially affected the substantial rights of the defendant" (i.e., is not harmless error). United States v. Nixon, 777 F.2d 958, 972 (5th Cir. 1985); see also United States v. Parker, 877 F.2d 327, 332 (5th Cir.), cert. denied, 493 U.S. 871, 110 S. Ct. 199, 107 L. Ed. 2d 153 (1989). In resolving this matter, we assess "(1) the magnitude of the statement's prejudice, (2) the effect of any cautionary instructions given, and (3) the strength of the evidence of the defendant's guilt." United States v. Tomblin, 46 F.3d 1369, 1389 (5th Cir. 1995). "The magnitude of the prejudicial effect is tested by looking at the prosecutor's remarks in the context of the trial in which they were made and attempting to elucidate their intended effect." Fields, 72 F.3d at 1207. The trial judge's on-the-scene assessment of the prejudicial effect, if any, carries considerable weight. See id.

We find Miller's reference to Telles and Wheeler appearing before the grand jury, even if improper, failed to prejudice Munoz's substantive rights. First, Miller never made another reference to testimony before the grand jury Cf. United States v. Heacock, 31 F.3d 249, 256 (5th Cir. 1994) ("We conclude that the introduction of one 'amended' photograph, which was later withdrawn from the exhibits, could not be prejudicial in a case with such an overwhelming set of incriminating facts."). Second, the trial judge instructed the jury at the start and conclusion of the trial not to consider statements, arguments, and questions by the attorneys as evidence. See United States v. Lokey, 945 F.2d 825, 837 (5th Cir. 1991). Finally, the Government presented

20

substantial witness testimony establishing Munoz's guilt as to each felon-in-possession charge. See Tomblin, 46 F.3d at 1391. These events, collectively, satisfy us that Miller's mention of the grand jury testimony of Telles and Wheeler did not prejudice Munoz's substantive rights.

We also conclude that Miller's assertions during closing argument about Government witnesses' truthfulness, when considered in context, fail to manifest plain error, the applicable standard of review because Munoz raised no objection below. These comments undoubtedly were intended as a response to Munoz's effort, central to his defense, to expose Government witnesses who had linked him to the guns as liars. See United States v. Thomas, 12 F.3d 1350, 1367 (5th Cir.), cert. denied, 511 U.S. 1114, 114 S. Ct. 2119, 128 L. Ed. 2d 676 (1994). Miller cited the threat of a perjury prosecution for giving false testimony to support her contentions. Cf. Washington, 44 F.3d at 1278-79. Moreover, even if they fell beyond the bounds of permissible behavior, her claims about the honesty of Government witnesses resulted in no prejudice to Munoz's substantive rights. The trial judge directed the jury immediately before closing arguments not to consider statements, arguments, and questions by the lawyers as evidence, and the Government presented substantial evidence of Munoz's guilt. See Lokey, 945 F.3d at 837; Parker 877 F.2d at 333. These circumstances do not evince plain error.

VI

Munoz views the trial judge's decision to give the jury an instruction on constructive possession as incorrect because the Government's evidence reflected "an actual possession theory." We review jury instructions to determine whether they, as a whole, correctly state the law and whether they clearly instruct jurors as to the principles of law applicable to the factual issues confronting them. See United States v. Gray, 105 F.3d 956, 967 (5th Cir.), cert. denied,

21

___ U.S. ___, 117 S. Ct. 1856, 137 L. Ed. 2d 1057 (1997). The instructions "must be legally accurate and factually supported by the evidence." Id. We view the evidence and all reasonable inferences that may be drawn from it in the light most favorable to the Government. See id.

"Possession of contraband may be either actual or constructive." United States v. McKnight, 953 F.2d 898, 901 (5th Cir.), cert. denied, 504 U.S. 989, 112 S. Ct. 2975, 119 L. Ed. 2d 594 (1992). Actual possession means the defendant knowingly has direct physical control over a thing at a given time. See United States v. Randall, 887 F.2d 1262, 1268 (5th Cir. 1989). Constructive possession means ownership, dominion or control over a thing, or control over the premises where the thing is found. See United States v. Torres, 114 F.3d 520, 524 (5th Cir. 1997). Possession may be sole or joint, see United States v. Smith, 591 F.2d 1105, 1107 (5th Cir. 1979), and shown through either direct or circumstantial evidence, see United States v. Garza, 118 F.3d 278, 283 (5th Cir. 1997).

We hold the evidence, when viewed in the light most favorable to the Government, to support the constructive possession instruction. Testimony disclosed that Munoz had asserted ownership of both the sawed-off shotgun and pistol. See Torres, 114 F.3d at 524; see also United States v. Warren, 594 F.2d 1046, 1050 (5th Cir. 1979) (co-defendant's testimony that she and defendant jointly owned the contraband and the car in which it was found supported finding of constructive possession). This proof establishes the constructive possession instruction as appropriate.

VII

22

Munoz, citing our decision in United States v. Mergerson, 4 F.3d 337, 349 (5th Cir. 1993), cert. denied, 510 U.S. 1198, 114 S. Ct. 1310, 127 L. Ed. 2d 660 (1994), maintains that the Government failed to present sufficient evidence to prove him either actually or constructively possessing the sawed-off shotgun. The trial judge rejected a motion for a judgment of acquittal based on this theory.[13]

We review the denial of a motion for a judgment of acquittal de novo. See United States v. Greer, 137 F.3d 247, 249 (5th Cir. 1998), cert. denied, ___ U.S. ___, 118 S. Ct. 2305, ___ L. Ed. 2d ___ (1998). In doing so, we consider "whether, viewing the evidence in the light most favorable to the government, a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." Id.

We conclude that the Government provided ample evidence to establish possession of the sawed-off shotgun. Wheeler reported witnessing Munoz handle the sawed-off shotgun, which discloses actual possession. See United States v. Ivy, 973 F.2d 1184, 1188 (5th Cir. 1992) (defendant actually possessed illegal narcotics when he took a package containing them and began to open it), cert. denied, 507 U.S. 1022, 113 S. Ct. 1826, 123 L. Ed. 2d 455 (1993). Moreover, both she and Telles stated that, during the time he was living in the Rojas apartment, Munoz had said that the sawed-off shotgun, which each of them had seen there, was his. This testimony suffices to show constructive possession. See Torres, 114 F.3d at 524; see also Warren, 594 F.2d at 1050. It, indeed, separates this case from Mergerson, 4 F.3d at 349, where we held that the

_____

[13] Munoz's focus on the sufficiency of the evidence leads us to conclude that he seeks reversal of the denial of his motion for a judgment of acquittal, not the denial of his motion for new trial, which makes the same argument. See Robertson, 110 F.3d at 1117. However, even if we construe his appeal as going to the denial of his motion for new trial, our ultimate disposition remains the same.

23

Government must provide more than the defendant's occupancy, along with others, of a residence where contraband is discovered to prove constructive possession. See United States v. Ybarra, 70 F.3d 362, 365 (5th Cir. 1995), cert. denied, 517 U.S. 1174, 116 S. Ct. 1582, 134 L. Ed. 2d 679 (1996). We, therefore, find Munoz's attack on the sufficiency of the evidence lacking merit.

VIII

Munoz contends that his conviction based on possession of the sawed-off shotgun must be reversed because evidence showing the weapon to be a 20-gauge effected a constructive amendment of count II of the indictment, which identified the weapon as a 12-gauge. The trial judge rejected this challenge on several occasions.

We must reverse a conviction based upon a constructively amended indictment. See United States v. Salvatore, 110 F.3d 1131, 1145 (5th Cir. 1997), cert. denied, ___ U.S. ___, 118 S. Ct. 441, 139 L. Ed. 2d 378 (1998). "A constructive amendment to the indictment occurs when the jury is permitted to convict the defendant on a factual basis that effectively modifies an essential element of the offense charged in the indictment." United States v. Millet, 123 F.3d 268, 272 (5th Cir. 1997), cert. denied, ___ U.S. ___, 118 S. Ct. 1306, 140 L. Ed. 2d 471 (1998). The alteration can be implicit or explicit. See id. Either the evidence or a jury instruction can effectuate it. See id.

Not every variance between the indictment's allegations and proof at trial engenders a constructive amendment. See id. For example, no constructive amendment arises "where the evidence proves facts different from those alleged in the indictment, but does not modify an essential element of the charged offense." Salvatore, 110 F.3d at 1145. Reversal occurs in this situation only if the divergence reflects more than harmless error (i.e., the variance is fatal). See

24

id. In this regard, our concern is whether the indictment has notified the defendant adequately to permit him to prepare his defense and has not left him vulnerable to later prosecution because of a failure to define the offense with particularity. See United States v. Puig-Infante, 19 F.3d 929, 936 (5th Cir.), cert. denied, 513 U.S. 864, 115 S. Ct. 180, 130 L. Ed. 2d 115 (1994); 3 Wright, supra § 516.

We consider unpersuasive Munoz's claim that evidence of the sawed-off shotgun's gauge constructively amended count II. The felon-in-possession statute, 18 U.S.C. § 922(g)(1), just requires the defendant to possess "a firearm" to violate it. 18 U.S.C. § 922(g); see United States v. Gresham, 118 F.3d 258, 265 (5th Cir. 1997) (listing essential elements of § 922(g)(1)), cert. denied, ___ U.S. ___, 118 S. Ct. 702, 139 L. Ed. 2d 645 (1998). As such, it fails to designate the gauge an essential element of the offense it defines. See United States v. Hamilton, 992 F.2d 1126, 1129-30 & nn. 4-5 (10th Cir. 1993) (indicating that the type of firearm represents a non-essential element of § 922(g)(1)); United States v. Morrow, 925 F.2d 779, 781-82 (4th Cir. 1991) (no constructive amendment of count charging violation of § 922(g)(1) when the evidence disclosed gun to have different serial number than one alleged). So the divergence of the evidence from count II does not manifest a constructive amendment.[14]

_____

[14] We reject Munoz's assertion that his prosecution resembles United States v. Leichtnam, 948 F.2d 370 (7th Cir. 1991), which involved 18 U.S.C. § 924(c). In Leichtnam, the introduction of three guns at trial and a jury instruction that conviction could occur if the defendant had used "a firearm" was found to have amended constructively the indictment's allegation that the defendant had used a Mossburg rifle. Id. at 379-81. Unlike that case, the Government here only proffered one gun to substantiate the charge in count II. See United States v. McIntosh, 23 F.3d 1454 (8th Cir.) (prosecution under § 924(c)(1)), cert. denied, 513 U.S. 935, 115 S. Ct. 333, 130 L. Ed. 2d 291 (1994).

25

We deem the variance between count II and the evidence as to the sawed-off shotgun's gauge to be harmless error because count II identifies possession of a firearm as its basis. See Hamilton, 992 F.2d at 1130 & n.6. This determination leaves Munoz's conviction for the felon-in-possession charge relating to the sawed-off shotgun intact.

IX

Munoz argues that the trial judge's reply to the jury's note about the variance between count II and the evidence as to the sawed-off shotgun's gauge violated his "constitutional right to have a jury consider all of the evidence against him submitted by the government" by preventing the jury from making those inferences favorable to him that it "reasonably could have . . . gleaned from the variance." In particular, he decries the answer for precluding the jury from considering the disparity in assessing the credibility of Salas, who misidentified the firearm as a 12-gauge. This argument derives from Munoz's reading of the response as a bar against consideration of the variance for any purpose.

We decide the appropriateness of an answer to a jury question by asking whether it was reasonably responsive to the inquiry and whether it and the original instructions, as a whole, allowed the jury to understand the issue. See United States v. Stevens, 38 F.3d 167, 170 (5th Cir. 1994). The trial judge may restrict his reply to "the specific limits of the jury's question, although [he] . . . may feel that [he] . . . should go beyond those limits in order that the answer will not be misleading or one-sided." 2 Charles Alan Wright, Federal Practice and Procedure § 502 (2d ed. 1982 & Supp. 1998); see United States v. Chatham, 568 F.2d 445, 451 n.10 (5th Cir. 1978) ("there is no error if the trial judge in the supplemental instructions charges exactly as he was requested").

26

We disagree with Munoz 's interpretation of the trial judge's response as a directive to ignore entirely the variance between count II and the evidence. The question's reference to the pages of the jury instructions reciting the elements of counts I and II shows the jury simply wanted to know if the gauge was an essential element of the offenses charged in those counts. The trial judge's answer, quite properly, focused on this specific issue and decisively settled it. As he was never asked and consequently never told the jury to disregard the variance entirely, we find no merit to the challenge to the answer to the jury question about the sawed-off shotgun's gauge.

X

Munoz maintains that the "synergistic prejudice caused by the combination of errors and improprieties" beginning with the search of the Rojas apartment and continuing through the jury's verdict collectively mandate reversal. In doing so, he asks us to invoke the cumulative error doctrine, which provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal. See United States v. Labarbera, 581 F.2d 107, 110 (5th Cir. 1978); United States v. Rothstein, 530 F.2d 1275, 1280 (5th Cir. 1976); see also United States v. Sepulveda, 15 F.3d 1161, 1195-96 (1st Cir 1993) (explaining the cumulative error doctrine), cert. denied, 512 U.S. 1223, 114 S. Ct. 2714, 129 L. Ed. 2d 840 (1994); United States v. Necoechea, 986 F.2d 1273, 1282-83 (9th Cir. 1993) ("In reviewing for cumulative error, the court must review all errors preserved for appeal and all plain errors."). For the sake of discussion, we accept Munoz's assumption that each of the errors are harmless. Since such miscues, if there are any, embody the non-constitutional variety of harmless error, we apply the standard articulated by Federal Rule of Criminal Procedure 52(a). See United States v. Rivera, 900 F.2d 1462, 1470 n.6

27

(10th Cir. 1990) (en banc).  Compare Fed. R. Crim. P. 52(a) (stating the harmless non-constitutional error standard) with United States v. Alexius, 76 F.3d 642, 646 (5th Cir. 1996) (stating the harmless constitutional error standard).

The coalescence of harmless errors, if any, arising in this case fail to result in a denial of a fair trial.  Munoz's claim of cumulative error, therefore, proves unavailing.

XI

Munoz disputes the trial judge assigning him to criminal history category VI based on the career offender sentencing enhancement.  He considers this determination wrong because his "conviction as a felon in possession of a firearm was neither a 'crime of violence' . . .  nor a controlled substance offense."  The Government counters that Munoz waived his challenge when he acquiesced to the trial judge's decision and that, regardless of whether or not he objected, the armed career criminal sentencing enhancement justified the criminal history category VI designation.

The Sentencing Guidelines contain enhancements for career offenders and armed career criminals.  One convicted under the felon-in-possession statute, § 922(g)(1), comes within the armed career criminal enhancement, not the one for career offenders, if he "has three previous convictions . . .  for a violent felony or a serious drug offense, or both, committed on occasions different from one another," 18 U.S.C. § 924(e)(1).[15]  See U.S. Sentencing Guidelines Manual §§ 4B1.2, 4B1.4 (1997) [hereinafter Manual] (commentary).  The armed career criminal enhancement sets the criminal history category as the greatest of the following:

---

[15] For the definitions of "violent felony" and "serious drug offense," see 18 U.S.C. § 924(e)(2).

(1) the criminal history category from Chapter Four, Part A (Criminal History), or § 4B1.1 (Career Offender) [of the Sentencing Guidelines] if applicable; or

(2) Category VI, if the defendant used or possessed the firearm or ammunition in connection with a crime of violence or controlled substance offense, defined in § 4B1.2(a), or if the firearm possessed by the defendant was of a type described in 26 U.S.C. § 5845(a)[, such as a shotgun having a barrel less than 18 inches in length]; or

(3) Category IV.

Id. § 4B1.4(c). As such, it differs from the career offender enhancement, which mandates a criminal history category VI for all persons covered. See id. § 4B1.1.

We review the application of a sentencing enhancement de novo. See United States v. Wyjack, 141 F.3d 181, 182-83 (5th Cir.1998); see also United States v. Brewster, 137 F.3d 853, 858 (5th Cir. 1998) (application of career offender enhancement); United States v. Canon, 993 F.2d 1439, 1441 (9th Cir. 1993) (application of armed career criminal enhancement). When the defendant makes no objection below, we resort only to plain error analysis. See United States v. Torrez, 40 F.3d 84, 86 (5th Cir. 1994).

We hold that the trial judge correctly applied the Sentencing Guidelines. Munoz's conviction as a felon-in-possession of a firearm combine with two previous convictions for violent felonies (i.e., the aggravated robbery convictions) and a previous serious drug offense conviction to bring him within the armed career criminal enhancement.[16] He must be assigned to criminal history category VI under this enhancement because, although his eleven criminal history points put him only in category V, his possession of a sawed-off shotgun with a 17 3/4 inch barrel bumps him up

---

[16] After reviewing the sentencing hearing and judgment, we conclude that the trial judge at least found Munoz to have 2 previous violent felony convictions and 1 previous serious drug offense conviction.

29

to the next level.  <u>See</u> 26 U.S.C. § 5845(a)(1); <u>Manual</u> §  4B1.4(c)(2).  This situation

demonstrates that the trial judge properly placed Munoz in criminal history category VI.[17]

XII

We AFFIRM as to all questions presented.

---

[17] We appreciate that the trial judge only cited the career offender enhancement during the sentencing hearing.  But the judgment, by adopting the PSR's application of the Sentencing Guidelines, removes doubt that he also relied on the armed career criminal enhancement. Consequently, his remark at the sentencing hearing was harmless error.  <u>Cf.</u> <u>United States v. Rogers</u>, 126 F.3d 655, 661 (5th Cir. 1997) (harmless error if trial judge would have imposed same sentence in the absence of the mistake); <u>United States v. Bonds</u>, 933 F.2d 152, 154 (2d Cir. 1991) (upholding two-level obstruction-of-justice enhancement where only 1 of 2 justifications is valid).